802 P.2d 1043

The **ST. PAUL PROPERTY AND LIABILITY INSURANCE COMPANY**, Plaintiff–Appellant,

v.

Bernard E. "Sonny" **EYMANN**; and Stan **Cusumano**, Defendants–Appellees.

No. 1 CA–CV 89–009.

Court of Appeals of Arizona, Division 1, Department E.

Aug. 23, 1990.

Review Denied Jan. 8, 1991.

Jones, Skelton & Hochuli by William J. Schrank, Phoenix, for plaintiff-appellant.

Holloway & Thomas by Paul W. Holloway, Kevin B. Sweeney, Phoenix, for defendants-appellees.

## OPINION

GRANT, Chief Judge.

St. Paul Property and Liability Insurance Company (St. Paul) appeals from a judgment entered on a jury verdict determining that Bernard E. Eymann's homeowner's insurance policy provided Eymann with liability coverage for Stan Cusumano's claim against him for injuries suffered when Eymann struck Cusumano in the face. St. Paul additionally appeals from a formal order denying its motion for new trial or judgment notwithstanding the verdict. St. Paul's appeal raises the following issues: (1) whether the trial court erred in permitting Joel Glassman to testify and render opinions regarding Eymann's state of mind and intent; (2) whether the trial court erred in denying St. Paul's motion for directed verdict based on the substance of Glassman's testimony; (3) whether the trial court erred in refusing to instruct the jury concerning the *Steinmetz–Clark* presumption;[1] and (4) whether the trial court erred in declining to clarify the term "mental derangement" as requested by the jury. We hold that the trial court erred in declining to direct a verdict for St. Paul, and accordingly do not reach the remaining issues.

## FACTS AND PROCEDURAL HISTORY

Viewed in the light most favorable to upholding the judgment, the facts are as follows. Cindy Cusumano and Bernard "Sonny" Eymann were married for approximately nine years, and had two children. In January of 1986, Cindy moved out of the Eymann home and into her own apartment in Tempe without warning. Eymann was upset, and over several weeks in January and February, spoke periodically to Cindy

---

1. *Steinmetz v. National American Ins. Co.,* 121 Ariz. 268, 589 P.2d 911 (App.1978); *Clark v.* *Allstate Ins. Co.,* 22 Ariz.App. 601, 529 P.2d 1195 (1975).

about their marriage. It seemed to Eymann that at that time Cindy was "sitting on the fence" about whether she would continue with the separation.

Stan Cusumano, a professional photographer, was a customer at Snappy Photo Finishing, a business owned by the Eymanns. Although Cindy first met Cusumano in December of 1985, she started seeing him socially after she filed for divorce. Eymann was not aware of this.

Several days before February 20, 1986, Cusumano was at Cindy's apartment helping her hook up her stereo when Eymann came over unexpectedly to talk to Cindy about the status of their marriage. Eymann was surprised to see Cusumano there and asked Cusumano to step outside for a moment, which Cusumano did. Eymann and Cindy had a conversation for a few minutes, then Eymann came out, thanked Cusumano and left.

Cusumano and Cindy arranged to go out to dinner the evening of February 20, 1986. That day, Eymann quit work around 6:00 P.M. and went home and fed the children. Sometime later he drove over to Cindy's apartment even though Cindy had not invited him and was not expecting him.

Cusumano had arrived earlier at Cindy's apartment to take her to dinner. While Cindy was in the bathroom getting ready and Cusumano was in her kitchen getting a glass of water, Eymann knocked on the front door. Cindy went to the window to the left of the front door, looked out and saw Eymann. She neither spoke to him nor answered the door. Instead, she walked back into the bathroom to finish getting ready to go out with Cusumano. Upset, Eymann pounded forcefully on the door and then broke the door open with his shoulder, entering the apartment. Eymann walked over where Cusumano and Cindy were now standing. Eymann was extremely upset, and Cindy and he began shouting at each other. At one point, Eymann asked Cusumano to leave. Eymann testified that Cusumano replied that the apartment was

neither his nor Eymann's, and that Eymann was "the one that had no business there and not him." According to Eymann, right after that Cusumano took a step toward Eymann with his hands up as if he were going to grab him. Eymann's impression was that Cusumano was going to try to throw him out. As Cusumano stepped toward him, Eymann hit him on the left side of the head with his right hand.[2]

Eymann testified that although he intended to hit Cusumano, he did so to stop Cusumano, and did not intend to hurt him. He claimed that he didn't direct a blow to the side of Cusumano's head, but swung at him as Cusumano tried to get him. He further testified that he knew he was hitting Cusumano, and while he "did not maybe realize the consequences of what it was going to do,.... [he] realized [he] was trying to stop him."

Both Cusumano and Cindy testified that Eymann said to each of them, "I am going to kill you," before he struck Cusumano. Eymann denied this. Cusumano denied making any sudden movements or raising his hands toward Eymann before Eymann struck him. Cusumano testified that Cindy asked Eymann to leave, and that in response to that Eymann looked at him as if to say "What do you think?" Cusumano testified that he threw up his hands and told Eymann it was not Cusumano's apartment, and was starting to turn to go back toward the refrigerator to get his drink of water when Eymann struck him.

After Eymann struck Cusumano, Cusumano slipped down to the floor and stayed there, holding his hands over his head and bleeding. Eymann immediately knelt by Cusumano, put his arms around him and told him he was sorry. Eymann began crying and fell over on the floor. Cusumano got up and went into the bathroom. Eymann got up, called Cindy a whore and hit her. He then left the apartment on his own.

Eymann testified he had never been in the same frame of mind or experienced the

---

**2.** Eymann does not contend that he acted in self defense or with any other privilege or justification in striking Cusumano.

same emotions before or since the evening of February 20, 1986. Cindy testified Eymann was extremely upset, emotionally distraught and out of control. She testified he had never threatened her before and was like a completely different person. She testified she had never seen him like that before or after that night.

On the evening of February 20, 1986, Eymann was covered by a personal liability policy issued by St. Paul. The policy provided in pertinent part:

LEGAL LIABILITY PROTECTION. Under the liability section of this policy you're covered when somebody makes a claim against you. We'll cover your legal liability ... if you're involved in a covered accident or incident where there is personal injury, anywhere in the world.

What's legal liability? Any injury, damage or loss that you're responsible for under the law.

. . . .

What do we mean by accident or incident? Anything that causes property damage, personal injury or death without you expecting or intending it. If you could've expected the result, you're not covered. The only exception is assault and battery committed to save a life or property.

Cusumano filed a civil action against Eymann. On October 6, 1986, St. Paul filed the instant declaratory judgment action against Eymann and Cusumano. St. Paul sought a declaration that its policy afforded no coverage for the damages and injuries Cusumano was claiming in his action against Eymann and imposed no duty on St. Paul to defend Eymann or otherwise participate in that action.

St. Paul took a default judgment against Cusumano. Its claim against Eymann was tried to a jury. Over St. Paul's objection, the trial court permitted Eymann's counsel to present expert opinion testimony from psychologist Glassman.

Glassman conducted an initial evaluation of Eymann on February 21, 1986. He diagnosed Eymann as suffering from an acute major depression caused by the divorce.

When asked whether Eymann had the mental capacity to form the intent to injure Cusumano, Glassman replied:

Mr. Eymann had the mental capacity to distinguish between whether his actions would be right or wrong. He could have made an intent, if that was what was occurring, he could have planned an intention because he had sufficient control over his intellect. If he had intentions of injuring somebody, he could have made that decision.

. . . .

So, my response to your question is, could he have planned an intention to injure someone? Yes, I think he could have, because he was in sufficient control when—of his intellect and his reason to do that. Did he have an intention of hurting someone? No. It turned out to be a spontaneous event that happened after he was denied entry, was told to go away, and was rejected again by his wife. And there still was no intent at that time, he just reacted.

Glassman also testified that Eymann's depressive state, together with the additional rejection he experienced, contributed to a welling up of emotions which was released through an angry outburst, and that his depression and anger in turn "significantly impaired his ability to control his actions." Glassman testified:

My opinion is that he suffered from a significant compromise in his judgment and his reasoning at the moment in time that evening due to his emotional state, and as a result of that, was not fully in control of his actions.

On cross-examination, Glassman testified that Eymann had no impairment of his intellect. He testified:

Q. And you never found him to have any derangement in his mental capacity, did you?

A. If I understand what derangement means, and my response is was he psychotic or was he suffering from a thinking disorder like a schizophrenia, the answer is no, he was not suffering from any of those.

Q. All right. And, in fact, on the evening of February 20, 1986, he was not suffering from any derangement as you just defined it; correct?

A. Correct.

He further testified:

Q. Doctor, you have expressed some opinions regarding Mr. Eymann's state of mind on the evening of February 20, 1986. And I want to ask you if it's fair to say that in your opinion as to Eymann, and, specifically, with respect to the evening of February 20, 1986, was that Mr. Eymann became emotionally enraged and exercised poor judgment in striking Mr. Cusumano?

A. That is correct.

At the close of all the evidence, St. Paul moved for a directed verdict. The trial court denied the motion. The jury returned a verdict in favor of Eymann and against St. Paul. The trial court entered final judgment in accordance with the verdict. It later denied St. Paul's motion for judgment notwithstanding the verdict or a new trial. St. Paul timely appealed.

## DENIAL OF ST. PAUL'S MOTION FOR DIRECTED VERDICT

### A. *Intentional Act Exclusion in General*

Arizona cases have held that an insured's mere commission of an intentional act that results in harm to another is not sufficient of itself to relieve the insurer of liability under a clause excluding coverage for harm "expected or intended from the standpoint of the insured." In *Vanguard Ins. Co. v. Cantrell*, 18 Ariz.App. 486, 503 P.2d 962 (1972), the insured robbed a drive-in liquor store while armed with a gun. To scare the attendant and make him duck so he would not recognize the insured or his vehicle, the insured shot over his left shoulder in the attendant's general direction as he drove away. The shot hit the attendant in the eye, seriously injuring him. Affirming a judgment for the attendant in a garnishment action against the insurer, Division Two of this court held the intentional act exclusion under the insured's home-

owner's policy did not apply. The court stated:

> Since the exclusionary clause did not clearly express an intention to exclude liability for unintentional or unexpected injury resulting from a deliberate act of the insured, we decline to hold the mere doing of an intentional act by the insured relieved the insurer of liability.

*Id.* at 489, 503 P.2d at 965.

This court later made clear, however, that the nature of certain intentional acts is such as to exclude liability coverage as a matter of law. In *Clark v. Allstate Ins. Co.*, 22 Ariz.App. 601, 529 P.2d 1195 (1975), appellant Clark tapped Niemi on the shoulder and struck him in the face as he turned, injuring him. Clark testified he intended to hit Niemi in the face, but did not intend to hurt him. Clark's homeowner's insurer brought a declaratory judgment action against Clark based on a policy exclusion for bodily injury "caused feloniously or intentionally by or at the direction of an Insured." Affirming summary judgment for the insurer, Division Two stated:

> The contention of young Clark that he did not intend to injure Niemi does not make the question of intention an issue of material fact which must go to the trier of fact. Perhaps if Clark maintained that striking Niemi was an accident, and that the blow itself was unintentional, summary judgment would be improper due to dispute over a material fact. However, the act of striking another in the face is one which we recognize as an act so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm, and his statement to the contrary does nothing to refute that rule of law.

*Id.* at 602, 529 P.2d at 1196. *Accord Steinmetz v. National American Ins. Co.*, 121 Ariz. 268, 589 P.2d 911 (App.1978) (affirming judgment for insurer where trial court instructed jury to consider whether insured intended to strike plaintiff, not whether he intended to injure him, and excluded evidence concerning insured's lack of subjec-

tive intent to injure plaintiff). The rule established in *Steinmetz* and *Clark*, that a person who intentionally commits an act virtually certain to cause injury is presumed to intend the resulting harm, is conclusive where applicable. *Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 358, 694 P.2d 181, 188 (1984). *See Twin City Fire Ins. Co. v. Doe*, 163 Ariz. 388, 788 P.2d 121 (App.1989) (assault and battery constituting child molesting); *Continental Ins. Co. v. McDaniel*, 160 Ariz. 183, 772 P.2d 6 (App.1988) (sexual harassment and assault).

In *Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 675 P.2d 703 (1983), our supreme court recognized the *Steinmetz–Clark* presumption, but held it inapplicable on the facts before it. In that case, Vagnozzi and Arias were playing basketball on opposing three-player teams. Vagnozzi and Arias both engaged in rough play. At one point Vagnozzi knocked Arias down, allowing the man Arias had been guarding to play momentarily unguarded. The ball still in play, Arias sprang up angry, swung his left elbow toward Vagnozzi's chest and lunged toward the man with the ball. At that instant, Vagnozzi bent over and Arias' elbow hit him in the face, knocking him over backward and causing him to hit his head on the concrete and pass out.

Arias later admitted that he intended to strike a blow to Vagnozzi but it was unclear whether Arias specifically intended to injure him. In Arias' insurer's declaratory judgment action, the trial court applied the *Steinmetz–Clark* presumption and granted summary judgment for the insurer.

Our supreme court reversed. It stated:

The presumption that a person intends the ordinary consequences of his voluntary actions, used in determining the responsibility for the consequences of voluntary acts, has no application to the interpretation of terms used in insurance contracts. *Vanguard Insurance Co. v. Cantrell*, 18 Ariz.App. 486, 503 P.2d 962 (1972). The intentional acts provision excludes policy coverage if the insured acts with the intent or expectation that bodily injury will result even though the result

is different in character from the injury intended. *Id.* Thus, the trier of fact must inquire into the actor's subjective intent. An act may be so certain to cause a particular injury that the intent to cause the harm is inferred as a matter of law and the subjective intent of the actor is immaterial. *Steinmetz, supra.* ... We do not find Arias' act was one so certain to cause the injury that the court cannot examine Arias' intent. The act which causes the injury cannot be viewed in isolation; the trial court must examine the transaction as a whole.

. . . .

For purposes of determining that a resulting injury was so certain to occur that the actor intended the harm as a matter of law, we find that intentionally throwing an elbow in an attempt to get the ball during a heated basketball game is distinguishable from deliberately punching a person in the face. Whether the injury was the intended result of Arias' act or whether the act constituted negligent or grossly reckless conduct is a matter upon which reasonable minds can differ.

138 Ariz. at 449–50, 675 P.2d at 709–10.

Contrary to Eymann's contention, the first sentence of this passage does not signal the *Vagnozzi* court's rejection of the *Steinmetz–Clark* presumption. The remainder of the passage makes it clear that *Vagnozzi* leaves the *Steinmetz– Clark* presumption fully intact, and that the supreme court meant only to confirm that the presumption will not be applied where the nature of the insured's act is not so certain to cause injury that an intention to cause injury must be inferred as a matter of law.

Recently the Supreme Court stated:

Determining whether an insured acts intentionally for purposes of insurance law is different than for purposes of tort law because there is no presumption in insurance law that a person intends the ordinary consequences of his actions. *Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 449, 675 P.2d 703, 709 (1983); *Van-*

*guard Ins. Co. v. Cantrell*, 18 Ariz.App. 486, 503 P.2d 962 (1972).

*Phoenix Control Systems, Inc. v. Ins. Co. of North America*, 165 Ariz. 31, 35, 796 P.2d 463, 467 (1990.)

The court in *Phoenix Control Systems* held that a two-prong inquiry is applied to determine an insured's intent. First, the insured's subjective desire to cause harm must be considered. The court said an act, even though intentional, must be committed for the purpose of inflicting injury. Second, if the intentional act was such that harm was substantially certain to result, intent may be inferred as a matter of law.

In *Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 694 P.2d 181 (1984), the supreme court again recognized the viability of the *Steinmetz–Clark* presumption, but engrafted a significant exception onto it. In *Meere*, the insured was sued by a third party for injuries sustained in a fight that the third party initiated and continued to press. The insurer brought a declaratory judgment action and prevailed in the trial court. On review of an opinion of this court holding that the intentional act exclusion in the policy applied, the supreme court reversed. It noted that it had recognized in *Vagnozzi* that the *Steinmetz–Clark* presumption does not apply in all cases. The court stated:

> We believe the blow struck in self-defense is analogous to that struck in an attempt to get to the basketball. In both cases the insured must be aware that his act possibly or even probably may cause injury. In neither case does the insured necessarily have a primary desire to injure the victim. The unprovoked blow, such as that struck in *Steinmetz* or *Clark*, however, is different. The *unprovoked* (unprivileged) act of striking someone in the face with a fist is an unequivocal manifestation of a basic purpose or desire to cause some injury and the law will not allow the insured to evade the applicability of the exclusions by protestations of innocence. The blow was volitional, the event was in the control of the insured, and no accident or calamity beyond his control occurred.

The law presumes he intended the result which was the natural consequence of his intentional act. In summary, in *Clark* and *Steinmetz*, the insured controlled the loss and thus fell within the category of risk which both the insurance contract and public policy consider uninsurable. In the case at bench, however, there is evidence from which the finder of fact may decide that Meere [the insured] was confronted with a risk over which he had little control. His blow may not have been the result of a cognitive process, and his action may not have been "voluntary." Although his act was intentional, and its natural consequence was to cause injury, his basic purpose may not have been to injure. The *Steinmetz–Clark* presumption does not apply.

*Id.* at 358, 694 P.2d at 188 (emphasis in original). In a companion case, *Fire Ins. Exchange v. Berray*, 143 Ariz. 361, 694 P.2d 191 (1984), the supreme court remarked:

> [A]s we stated in *Meere*, 143 Ariz. at 358, 694 P.2d at 188, the *Steinmetz– Clark* presumption does not apply to the language of an "intentional acts" exclusion clause when an insured acts in self-defense or with some other justification. In such cases, the question of intent must be resolved by a determination of the basic purpose or desire underlying the insured's conduct.

*Id.* 143 Ariz. at 363, 694 P.2d at 193. In *Phoenix Control Systems* the supreme court said that an insured is conclusively presumed to intend injury when he strikes another without provocation citing *Steinmetz* and *Clark*.

### B. *Intentional Act Exclusion—Lack of Mental Capacity*

In its discussion in *Meere*, the supreme court also recognized for the first time a distinct exception to the *Steinmetz–Clark* presumption based on the mental capacity of the insured:

> [W]here the insured commits an intentional act causing injury but lacks the mental capacity to act "rationally," the clause does not apply because its application would be "inconsistent with a pri-

mary purpose for incorporating intentional injury exclusions ..., *i.e.*, to preclude individuals from benefiting financially when they deliberately cause injury." *Globe American Casualty Co. v. Lyons*, 131 Ariz. [337] at 339–40, 641 P.2d [251] at 253–54.

143 Ariz. at 359, 694 P.2d at 189. *See also Von Dameck v. St. Paul Fire & Marine Ins. Co.*, 361 So.2d 283 (La.Ct.App.1978) (presumption that one intends natural and probable consequences of acts should not be applied to an insane person); 10 *Couch on Insurance* 2d (Rev.Ed.1982) § 41.676 (intentional act exclusion inoperative where insured was insane to such degree or so bereft of reason because of intoxication as to be incapable of forming an intention).

In *Globe American Cas. Co. v. Lyons*, 131 Ariz. 337, 641 P.2d 251 (App.1981), to which the *Meere* court referred, the insured purposely drove her car directly into a pickup truck. The occupants, who were injured, sued her. Her insurer brought a declaratory judgment action against them and prevailed after a trial to the court. Relying on *Clark v. Allstate Ins. Co.*, 22 Ariz.App. 601, 529 P.2d 1195 (1975), the trial court found that because the insured "intentionally" caused the collision, her insurance policy provided no coverage. On appeal, the injured parties urged that the intentional act exclusion should not apply because the insured had been attempting suicide in an uncontrollable response to auditory hallucinations that overcame her ability to act rationally.

We reversed, noting that "*Clark* does not address the effect of the mental illness on the presumption. Rather that case dealt with intended acts versus intended consequences." 131 Ariz. at 339, 641 P.2d at 253. We rejected the insurer's argument that mental illness is irrelevant for the purpose of determining whether an act is intentional, citing the rule that exclusionary provisions are to be strictly construed against an insurer. We further stated:

[T]o deny coverage for acts caused by an individual lacking the mental capacity to act rationally is inconsistent with a primary purpose for incorporating inten-

tional injury exclusions into insurance policies, *i.e.*, to preclude individuals from benefiting financially when they deliberately cause injury. An individual who lacks the capacity to conform his behavior to acceptable standards will not be deterred by the existence or nonexistence of insurance coverage for the consequences of his acts. *See Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co., supra* [91 Cal.App. 3d 690, 154 Cal.Rptr. 348 (1979)].

131 Ariz. at 339–40, 641 P.2d at 253–54.

We also rejected the view that the *M'Naghten* test for criminal insanity should be applied to determine the applicability of an intentional act exclusion. We instead adopted the following standard, quoting from *Ruvolo v. American Cas. Co.*, 39 N.J. 490, 498, 189 A.2d 204, 208–09 (1963):

We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason and while in that condition [acted] on an irrational impulse ... his act cannot be treated as "intentional" within the connotation of defendant's insurance contract.

131 Ariz. at 340, 641 P.2d at 254. We stated:

Applying this test to the instant case, if Mrs. LeDoux [the insured] was suffering from mental derangement which deprived her of her capacity to act in accordance with reason and while in that condition acted on an irrational compulsion to drive her vehicle into oncoming traffic, her act was not "intentional".

*Id.* We then determined that the record contained insufficient evidence to support a conclusion that the insured was able to act in accordance with reason at the time of the collision.

### C. *Evidence Concerning Eymann's Mental Capacity*

In the instant case, St. Paul contends that the evidence at trial raised no jury issue concerning whether Eymann's mental state satisfied the *Lyons* test when he

struck Cusumano. St. Paul urges that as a matter of law the *Steinmetz–Clark* presumption applied, and the trial court should have directed a verdict in its favor.

■ We cannot agree with St. Paul that it was entitled to a directed verdict based exclusively on Glassman's testimony that Eymann suffered from no intellectual impairment, psychosis or thinking disorder. Although the test we adopted in *Lyons* requires that the insured have suffered from a "derangement of his intellect," we treated that phrase as equivalent to the intrinsically broader term "mental derangement." 131 Ariz. at 340, 641 P.2d at 254. One of the primary purposes of an intentional act exclusion is to preclude persons from benefiting financially when they cause injury "deliberately." *Id.* The core element of the *Lyons* test is not the diagnostic category into which the insured's mental condition may fit, but rather the requirement that his condition deprive him of the capacity to act rationally and therefore negate the deliberateness of his "intentional" injury-causing act. *See Meere,* 143 Ariz. at 359, 694 P.2d at 189. Intellectual dysfunctions and cognitive psychoses are not the only mental afflictions, chronic or temporary, that may operate in that way. *Cf. Parkinson v. Farmers Ins. Co.,* 122 Ariz. 343, 594 P.2d 1039 (App.1979) (mental illness or intoxication destroying the capacity to form intent to cause injury).

■ We nevertheless agree with St. Paul that there was insufficient evidence in this case to raise an issue for the jury on whether Eymann met the *Lyons* test when he struck Cusumano. The *Lyons* test requires that the mental condition which the insured was suffering "deprive[ ] him of the capacity to govern his conduct in accordance with reason...." 131 Ariz. at 340, 641 P.2d at 254 (citation omitted). Although Glassman diagnosed Eymann as suffering from "acute major depression" at the time in question, nothing exists in his testimony or elsewhere in the record from which a jury could reasonably conclude that this condition truly "deprived" him of the mental capacity to act rationally. Glassman testified only that Eymann's de-

pression and the events of the evening of February 20, 1986, "significant[ly]" compromised "his judgment and his reasoning," leaving him "not fully in control of his actions." When Eymann's counsel asked Glassman if Eymann's depression and anger resulted in his "being unable to control his actions on February 20, 1986," Glassman could only state that "it significantly impaired his ability to control his actions." Glassman further agreed with Eymann's counsel that Eymann's mental condition and the events of that evening "precluded in him the ability to control his *judgment* over his actions." (Emphasis added.) Similarly, Glassman agreed with St. Paul's counsel's suggestion that "Mr. Eymann became emotionally enraged and exercised poor judgment in striking Mr. Cusumano." In our opinion, none of this evidence supports the proposition that Eymann's condition left him unable to act rationally. The evidence establishes at most that Eymann's judgment, and consequently his ability to control his actions, was to some extent impaired. In that condition he was still able to act deliberately so as to cause injury, and according to his own testimony, did so.

*Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co.,* 91 Cal.App.3d 690, 154 Cal.Rptr. 348 (1979), on which Eymann relies, is of no help to him. In that case the 16–year–old insured set fire to a wastebasket in a classroom and caused extensive property damage. On appeal from judgment for the insurer, the court reversed and remanded for a new trial because the trial court erroneously instructed the jury that it could find coverage only if the insured had not understood the nature and quality of his act or could not distinguish between right and wrong.

Eymann's discussion of *Congregation of Rodef Sholom* implies that the California appellate court concluded that a jury determination of the insured's mental capacity was appropriate based principally on evidence that the insured was suffering from an "adolescent adjustment reaction" that caused him a severe feeling of rejection and produced in him an "overwhelming"

desire to set the fire. In fact, there was also evidence in that case that the insured had a schizoid personality, suffered delusions and auditory hallucinations, and was "impelled by an impulse *which he did not have the power to resist.*" 91 Cal.App.3d at 693, 154 Cal.Rptr. at 350 (emphasis added). No comparable evidence concerning Eymann was presented in this case.

Eymann, however, emphasizes the following testimony of Glassman:

> Did he have an intention of hurting someone? No. It turned out to be a spontaneous event that happened after he was denied entry, was told to go away, and was rejected again by his wife. And there was still no intent at that time, he just reacted.

This testimony was insufficient to take the case to the jury. Glassman also acknowledged that Eymann was in sufficient control of his intellect and his reason to form an intention to injure someone. Moreover, the context immediately preceding this testimony reveals that Glassman was not focusing on Eymann's mental functioning at the moment he struck Cusumano, but rather on the immaterial question of whether Eymann formed an intention to hurt his wife or her boyfriend before even arriving at his wife's apartment. Glassman testified:

> His condition, as I understood it from my evaluation and from my assessment due to his emotional state at the time that he had absolutely no intent of trying to find out who someone—who a person may have been who might have stolen his wife away from him or was responsible or that he wanted to injure his wife in any fashion. He just wanted to go back to her apartment and attempt to reconcile with her. He had no intentions, from the best that I was able to assess, of wanting to hurt someone or to injure someone. He just wanted his wife back.

Finally, it is clear from Eymann's own testimony that he "reacted" intentionally. Eymann testified:

> Q. [Y]ou hit him on the left side of the head with your right hand; right?
>
> A. Yes.

> Q. Okay. And when he stepped towards you and you hit him, you intended to hit him, didn't you?
>
> A. I intended to hit him.

There was no evidence from which a reasonable jury could have concluded that Eymann's mental state when he struck Cusumano so overmastered his will as to disable him from acting rationally. In addition, unlike the insureds in *Vagnozzi* and *Meere*, Eymann has not taken the position that his conduct toward Cusumano was privileged or otherwise justified. Finally, we find that like the conduct in *Steinmetz* and *Clark*, Eymann's conduct was of a type so certain to cause injury to Cusumano that Eymann's intent to cause injury must be conclusively presumed. We accordingly conclude that the trial court erred in denying St. Paul's motion for a directed verdict.

Because of our disposition of this appeal, we have not addressed the question whether the trial court erred in denying St. Paul's motion *in limine* to preclude Glassman's testimony altogether. Similarly, we need not consider whether the trial court erred in declining to instruct the jury on the *Steinmetz–Clark* presumption, and whether the trial court committed error in responding to a request by the jury for further clarification of the term "mental derangement."

## ATTORNEY'S FEES

St. Paul requests this court to reverse the award of attorneys' fees and costs to Eyman and Cusumano below, and to award St. Paul its costs and fees incurred in discovery, at trial, and on appeal, pursuant to A.R.S. § 12–341.01. In accordance with the decision we reach today, we vacate the trial court's award of costs and fees below because the defendants are no longer the prevailing parties. However, in our discretion, we decline to award St. Paul its costs and fees incurred below and in this appeal. *See Associated Indemn. Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985).

## DISPOSITION

Reversed and remanded with directions to enter judgment N.O.V. in favor of St. Paul.

CLABORNE, P.J., and GERBER, J., concur.