905 P.2d 527

**STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation, Plaintiff–Appellee, Cross–Appellant,**

v.

**Jack BROWN, formerly listed as John Doe, individually, Defendant–Appellant, Cross–Appellee,**

and

**H.B.H., a single person,[1] and T.H., a minor child, Defendants–Appellants, Cross–Appellees.**

No. 1 CA–CV 93–0146.

Court of Appeals of Arizona, Division 1, Department D.

April 27, 1995.

Review Denied Nov. 21, 1995.

Stinson & Sever, P.A. by William G. Stinson, Jr., Dennis A. Sever, Phoenix, for plaintiff-appellee, cross-appellant.

Steven J. Wells & Associates by Timothy L. Moulton, Edwin R. Roberts, Tempe, for plaintiff-appellee, cross-appellant.

Renaud, Cook, Videan, Geiger & Drury, P.A. by William W. Drury, Jr., Charles A. Struble, Phoenix, for defendants-appellants, cross-appellees.

Broening, Oberg & Woods, P.C. by James B. Broening, Neal B. Thomas, Phoenix, for amicus curiae Farmers Ins.

## OPINION

CONTRERAS, Judge.

State Farm Fire and Casualty Company ("State Farm") brought a declaratory judgment action against both its insureds, Jack Brown and his wife ("Brown"), and a child molestation victim and her mother. The child and her mother previously had filed a civil tort action against Brown for injuries suffered from molestations perpetrated by Brown. Brown held a State Farm homeowner's insurance policy, and State Farm defended Brown in the tort action under a reservation of rights provision. In the pres-

---

1. We have abbreviated these defendants' names in the interest of the child.

ent declaratory judgment action, State Farm contended that Brown's acts of molestation were intentional acts and therefore excluded from insurance coverage.

After a bench trial in the superior court, the judge found that Brown did not act intentionally in molesting the victim and, thus, that State Farm's policy covered Brown's acts. State Farm filed a motion for new trial and for judgment in its favor. A *pro tem* judge granted the motion for new trial only.[2] The victim and her mother appeal from the grant of a new trial; State Farm cross-appeals from the denial of judgment in its favor. Although we find no abuse of discretion in the grant of a new trial, we conclude that State Farm was entitled to judgment. Accordingly, we reverse the granting of the motion for new trial and remand for entry of judgment for State Farm.

### FACTUAL AND PROCEDURAL BACKGROUND

Beginning in the summer of 1986 and continuing until March or April 1987, Jack Brown sexually molested a six-year old female child. The child and her mother sought damages in tort from Brown. *See H.B.H. v. State Farm Fire and Cas. Co.*, 170 Ariz. 324, 823 P.2d 1332 (App.1991). In the present declaratory judgment action brought by State Farm, however, the sole issue is whether Brown's mental condition deprived him of the capacity to "intend" his actions under the test adopted in *Globe Am. Cas. v. Lyons*, 131 Ariz. 337, 641 P.2d 251 (App.1981).[3]

In a bench trial to Judge Philip W. Marquardt, the evidence established that Brown became acquainted with the victim and her mother in 1981. He continued a friendship with the child and her mother over the next five or six years that permitted him to spend time alone with the child and to take her swimming and horseback riding. He also occasionally asked her to give him a massage or back rub and played a guessing game about the color of his or her underwear.[4] In private, he fondled the child, digitally penetrated her vagina, and had the child masturbate him; he also extracted promises of secrecy to hide his actions.

On the question of Brown's intent, Phillip W. Esplin, Ed.D., State Farm's expert, testified that although Brown was very bright and intelligent, he was also cunning and manipulative. He diagnosed Brown as a regressed pedophile who admitted that he was sexually attracted to the child victim and "likely had a sexual interest in age-inappropriate youngsters for quite some time." Dr. Esplin found the lack of sexual intimacy between Brown and his wife, that began six months after their marriage and continued over a number of years, relevant to determining the strength of his sexual interest in age appropriate individuals and significant in light of Brown's request that his wife wear clothing during sex and his desire to "play games ... [and] act like a small child" as a prelude to sexual activity. These acts suggested an interest in children "going back quite some time," according to Dr. Esplin.

In concluding that the molestations were intentional, rather than impulsive or opportunistic, Dr. Esplin considered the number of molestations (Brown admitted to either three or four while the child estimated as many as seventeen); that they occurred over an extended period, at different times and places, on occasions when Brown was able to be alone with the child; and that they were followed by pacts of secrecy. The pacts of secrecy also showed that however he might rationalize the acts to himself, Brown knew that his actions would be perceived by others as harmful.

---

2. The bench trial was held before Judge Philip W. Marquardt. After ruling in favor of appellants, Judge Marquardt resigned, and the case was assigned to Nicholas Udall, Judge *Pro Tem* for post-trial proceedings.

3. In *Globe*, this court held that an act of an insured cannot be treated as intentional if the insured suffered from a "derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason and while in that condition the insured [acted] upon an irrational impulse." 131 Ariz. at 340, 641 P.2d at 254 (emphasis added).

4. Dr. S. David Mazen referred to Brown's efforts to befriend and desensitize the child to physical contact as a "grooming" process typically used by sex offenders to prepare the victim for later molestations.

Dr. Esplin stated that Brown "made a conscious, reasoned decision" to become sexually involved with the child and in order to accomplish that goal, "formulated and executed a series of complex acts ... that ... would require the capacity ... to reason, to judge potential outcome. And ... they would have been rational, logical and goal-oriented." He found no evidence from the psychological tests, observations of other individuals who were around Brown during the time of the molestations, or the manner in which the molestations took place that they could be classified as irrational impulses.

Dr. Esplin stated that stress from marital or financial difficulties might lessen Brown's self-control and act as a disinhibitant but that whatever stress Brown felt "by no means deprived him of [his reasoning]." Dr. Esplin also strongly stated that stress short of catastrophic levels does not *destroy* judgment and reasoning. In determining that Brown was not suffering from a mental derangement which deprived him of his capacity to govern his conduct with reason, Dr. Esplin pointed to Brown's pre-molestation actions of ingratiating himself, desensitizing the child to physical contact, finding or creating occasions to be alone with her, and forming the type of relationship which would lessen the probability of disclosure.

Dr. Esplin also testified that none of the psychological tests performed by Dr. Mazen indicated a significant thought disorder, psychosis, or organic brain syndrome which would affect Brown's ability to reason.

S. David Mazen, Ed.D., defendants' expert, had counseled Brown and his wife for marital problems between March and October 1986. He began treating Brown again in April 1987 after the molestations came to light. Dr.

Mazen testified that he would have diagnosed Brown with a generalized anxiety disorder[5] during 1986 based on Brown's low self-esteem and his marital and employment difficulties. Dr. Mazen stated that when he returned for treatment in 1987, Brown's stress levels were even higher due to his fear of legal action and of loss of contact with his daughter after he and his wife divorced.

Dr. Mazen acknowledged that Brown did not suffer from any psychosis or organic brain disorder. He testified, nevertheless, that during the time Brown was molesting the child, he suffered a derangement of the intellect and a generalized anxiety disorder. The latter was a contributing factor in the deprivation of Brown's capacity to govern his conduct with reason and led him to act on an irrational impulse, thus satisfying the *Globe* test.

Dr. Mazen diagnosed Brown as a "regressed child molester," as defined by the DSM–III–R, but not a pedophile.[6] He testified that it was a generally accepted theory within the field of psychology that stress can precipitate a regressed child molester. He did not say, however, that stress caused Brown's actions, only that it contributed to his actions. Dr. Mazen stated that to compensate for the stress, Brown engaged in the molestations just as others might use to an excess sleep, drugs, alcohol, or sex; all of these behaviors, he stated, "are out of the conscious control of the individual."

He contended that the preseduction and grooming acts, as well as the molestations themselves, were out of Brown's control, although Brown was not out of control at all times.[7] Based on work with other sex offenders, he believed that Brown suffered lack of control just before and during each moles-

---

5. Defined by the Diagnostic and Statistical Manual of Mental Disorders ("DSM–III–R").

6. The DSM–III–R recognizes a differential diagnosis for pedophilia which states in pertinent part:

Isolated sexual acts with children do not necessarily warrant the diagnosis of Pedophilia. Such acts may be precipitated by marital discord, recent loss, or intense loneliness. In such instances the desire for sex with a child may be understood as a substitute for a preferred but unavailable adult.

7. Dr. Mazen testified:

I'm not sure I can answer when it [the loss of reason] started prior to the molestation. I think the stress was there all the time.... And when the stress in his mind became so intense, he lost his control, gave up his control. In most cases ... he indicated to me ... that within minutes, if not seconds after the molestation took place, he returned to reason. He was able to say, Gee whiz, what have I done? I've done this again, and I didn't want to.

tation. The pacts of secrecy showed that Brown knew what he had done and that it was wrong *immediately after* each act of molestation. He also stated that he assumed that Brown had sexual thoughts during the molestations but was uncertain that Brown had sexual thoughts about the child.

State Farm objected to much of Dr. Mazen's testimony on foundational grounds and moved to strike his testimony. It contended that no scientific evidence demonstrated that stress or generalized anxiety disorder either causes sexual deviancy or deprives one of the ability to govern one's conduct with reason. State Farm also objected that Dr. Mazen, not a forensic psychologist, lacked the expertise to determine Brown's state of mind at the time of the molestations and had failed to adequately investigate that issue before giving an opinion.

Judge Marquardt denied State Farm's motion to strike Mazen's testimony and ruled that State Farm's objections went more to weight than admissibility. At the conclusion of the trial, Judge Marquardt found that: the generalized anxiety disorder precipitated in Brown a condition of a regressed child molester who was deprived of the capacity to act rationally; the intentional acts exclusion did not apply; and thus, State Farm's policy covered the molestations.

Judge Udall granted State Farm's motion for a new trial. He found neither the law nor the evidence supported a finding that Brown suffered a "derangement of his intellect" which deprived him of the capacity to govern his conduct in accordance with reason but rather supported the opposite conclusion that his acts were intentional. Judge Udall also found that Dr. Mazen was not qualified to render an opinion as to Brown's state of mind at the time of the molestations and that his testimony lacked sufficient foundation to be credible. Finally, Judge Udall concluded that Judge Marquardt erred in ruling that the molestations were irrational acts, *per se.*

---

8. Farmers Insurance Company of America filed an amicus brief urging us to disregard the intentional acts issue and instead to rule that child molestation does not constitute an "occurrence" as defined by the standard homeowner's policy. Neither party raised this argument, and thus we

## DISCUSSION

## I. THE MOTION FOR NEW TRIAL

### A. Standard of Review

■ A trial judge has broad discretion to grant or deny a new trial. *Anderson v. Preferred Stock Food Markets, Inc.*, 175 Ariz. 208, 211, 854 P.2d 1194, 1197 (App. 1993). We review an order granting a new trial under a more liberal standard than an order denying one, and we will not overturn the order absent a clear abuse of discretion. *Martinez v. Schneider Enterprises, Inc.*, 178 Ariz. 346, 348, 873 P.2d 684, 686 (App.1994). If the verdict, decision, findings of fact, or judgment are not justified by the evidence or are contrary to law, a new trial is proper. Ariz.R.Civ.P. 59(a)(8).

Generally, an appellate court defers to factual findings made by the trial court. *Globe*, 131 Ariz. at 343, 641 P.2d at 257. If the court's findings are also conclusions of law, however, we are not bound by them. *Id.*

### B. Evidence That Brown Lacked Capacity to Govern His Conduct with Reason

■ The sole issue below was whether Brown's mental condition at the time of the molestations satisfied the *Globe* test.[8] 131 Ariz. at 340, 641 P.2d at 254. In reviewing the motion for new trial, Judge Udall determined that the evidence did not justify the judgment for the defendants. We do not find a clear abuse of discretion in that determination, particularly because Brown's expert did not discern a difference between an *impaired* capacity to reason and *deprivation* of capacity.

In *Globe*, the insured drove her car into a truck in an unsuccessful suicide attempt and was sued by the truck's injured occupants. Her insurer prevailed in a declaratory judgment action against the injured parties after claiming that its insured "intentionally" caused the collision and thus that the policy

may not consider it. *Dixon v. Picopa Const. Co.*, 160 Ariz. 251, 257 n. 10, 772 P.2d 1104, 1110 n. 10 (1989) (Amici may appear and argue for or against an issue raised by one of the parties but may not present new issues not raised below).

did not cover her actions. The trial court agreed and entered judgment for the insurer. The injured parties unsuccessfully moved for a new trial.

On appeal, they argued that the insured acted "in an uncontrollable response to auditory hallucinations that overcame her ability to act rationally." *Id.* at 338–39, 641 P.2d at 252–53. The evidence revealed that the insured had been hospitalized and diagnosed as a paranoid schizophrenic, had been suicidal on other occasions, had "acute brain syndrome and hallucinosis as a result of alcohol abuse," and had received electric shock treatments for auditory hallucinations. *Id.* at 342, 641 P.2d at 256.

This court reversed the trial court with directions to enter judgment for the appellants. We held that an insured *"suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason and while in that condition [who] [acted] on an irrational impulse"* does not act intentionally for purposes of an intentional acts exclusion in insurance coverage. *Id.* at 340, 641 P.2d at 254 (emphasis added). We concluded that the record did not contain substantial evidence of the insured's ability to act with reason but rather revealed overwhelming evidence to the contrary. *Id.* at 343, 641 P.2d at 257.

More recently, *St. Paul Property & Liab. Ins. Co. v. Eymann,* 166 Ariz. 344, 802 P.2d 1043 (App.1990), clarified the scope of the "intentional act" exclusion. Eymann and his wife had separated. In an emotional confrontation with his wife and a man she was dating, Eymann struck the man. Eymann's insurer brought a declaratory judgment action to determine whether the intentional acts exclusion would permit it to deny coverage for the injuries Eymann had inflicted. A psychologist testified that Eymann's divorce caused acute major depression which " '*significantly impaired* his ability to control his

actions,' " and that he "was not *fully in control* of his actions." *Id.* at 347, 802 P.2d at 1046 (emphasis added).

We held that the psychologist's testimony was insufficient under *Globe. Id.* at 352, 802 P.2d at 1051. Testimony that the insured's ability to control his actions was "significantly impaired" demonstrated, at most, that his judgment may have been affected but not that his "condition truly 'deprived' him of the mental capacity to act rationally." *Id.* Thus, while Eymann's depression significantly impaired his judgment and reasoning and thus the ability to control his actions, he could still act deliberately in causing injury. *Id.*

After reviewing the record here, it is our opinion that no reasonable trier of fact could conclude from the evidence offered by Dr. Mazen that Brown's anxiety disorder totally deprived him of the ability to govern his conduct with reason. Dr. Mazen's opinion is similar to the evidence offered in *Eymann.* Although Dr. Mazen asserted at trial that Brown suffered a mental condition which destroyed his capacity to form an intent to cause injury, Dr. Mazen equated "impaired" with "deprived." [9] He stated that Brown's reasoning capacity was highly impaired, [10] but he could not say to what degree, and he testified that during the molestations, Brown "was not *in complete charge* of his faculties and his reason," (emphasis added), which suggests Brown had some degree of control.

Dr. Mazen testified that, unlike either a fixed or regressed pedophile who "acts with reason" because his sexual preference is for children, a regressed child molester like Brown molests out of a need to compensate for tension and discomfort and acts *not* in accordance with reason. Dr. Mazen agreed with defense counsel's statement that Brown's stress level was so high that it constituted a derangement of his intellect which deprived him of the capacity to govern his

---

9. Q. You're saying impaired and deprived means the same thing?
   A. To me they do, yes.
   Q. Define impaired.
   A. I defined it the same way, deprived, that he was incapable of reasoning logically at that moment.

10. The term "deprive" is traditionally defined as, "to take something away from" or "withhold." *See, e.g., Webster's New Collegiate Dictionary* 305 (1976). The word "impair" means "to make worse by" or "to diminish." *Id.* at 574.

conduct with reason. Brown's counsel also argued that Brown was compelled to do something that was beyond his control.

Dr. Mazen's conclusions about the source of Brown's derangement were substantially undermined by Dr. Esplin's testimony. Dr. Esplin disagreed that stress could cause deviant sexual acts but conceded that it could cause one to act on a pre-existing deviant interest. He also stated that a generalized anxiety disorder is considered a mild condition insufficient to destroy the capacity to reason. Brown's reported stresses, largely due to marital and financial problems, are classified on the DSM–III–R as "moderate" or "severe" but not "extreme" [11] or "catastrophic." [12] Dr. Esplin found no other evidence suggesting that Brown felt catastrophic stress and thus concluded that Brown's stress was insufficient to *destroy* his capacity for reasoning.

The evidence was undisputed that Brown suffered no psychosis, brain disorder, or other disease, but Judge Marquardt nevertheless found that Brown's generalized anxiety disorder caused a "derangement." He also found Brown to be a "regressed child molester" as defined by the DSM–III–R and as diagnosed by Dr. Mazen. Dr. Mazen's diagnosis relied at least in part upon the DSM–III–R and a treatise by Dr. Nicholas Groth; both sources acknowledge that severe stress can impair judgment and resistance to deviant behavior, but neither supports a finding that severe stress can completely deprive a person of reasoning capacity.

Thus, we conclude that substantial evidence did not support a finding that Brown suffered a derangement of his intellect which deprived him of the capacity to govern his conduct with reason. Judge Udall did not abuse his discretion in granting the motion for new trial on this basis.

11. Examples of extreme stressors are sexual or physical abuse or the death of a parent.

12. Catastrophic stressors include the death of a child, concentration camp torture, or battle stress.

13. Dr. Mazen testified that very few child molesters are true pedophiles, but that most are "regressed child molesters" like Brown. The stalking and grooming process is "part of the whole

## C. Evidence That Brown Acted on Irrational Impulse

The second prong of the *Globe* test requires that the actor, while suffering a derangement that deprived him of the capacity to govern his conduct with reason, act on an irrational impulse. 131 Ariz. at 340, 641 P.2d at 254. On the second day of trial and *before* the experts testified, Judge Marquardt discussed the *Globe* standard. He stated on the record that Brown's acts were irrational.

> It seems to me that molestation of a child is not a act committed with reason.
>
> .    .    .    .    .
>
> Again, the molestation of a child was an irrational course of conduct.... [T]o me at least that's clear. It was an impulse, and ... I think we have here a—a series of impulses that took place.
>
> [W]hat still has to be decided is, was he suffering from a derangement of his intellect?

A reasonable finder of fact cannot conclude, in advance of hearing the psychological evidence, that a person who receives sexual gratification from sexual conduct with a child is *per se* irrational. We agree with State Farm that Judge Marquardt erred in finding that he could assume Brown's actions were irrational impulses and thus satisfied the second prong of the *Globe* test before hearing evidence on this issue.

Dr. Mazen's theory that the molestations were attempts to relieve stress and that the loss of reason during the grooming process and the molestations, followed almost immediately by regret and a return to reason, is largely based on anecdotal self-reports from Brown and other child molesters.[13] This evidence is insufficient to support a conclusion that Brown acted on irrational impulse.

process of the sex offense cycle" and pacts of secrecy are common. Dr. Mazen concluded that Brown acted on an "irrational impulse" because many sex offenders report, as Brown did, feeling out of control and unsure why they molest. Dr. Mazen's opinion that Brown was deprived of his capacity to reason was based on working with approximately 300 to 350 sex offenders who reported almost identical processes.

Dr. Esplin, on the other hand, testified to factors indicating that the acts were rational and goal-directed: they occurred over a nine-month period, began with "preseduction familiarization" and ingratiation, progressed to desensitizing behavior, and required Brown to both find opportunities for privacy and to form a relationship which would minimize the chance of discovery. Dr. Esplin concluded that Brown's cunning and manipulation reflected a purposeful intent to commit the acts and that this evidence militated against a conclusion that Brown acted on an irresistible impulse.

Defendants argue, however, that planned, goal-directed actions are not necessarily rational. They point to *Reinking v. Philadelphia Am. Life Ins. Co.*, 910 F.2d 1210 (4th Cir.1990), *overruled in part on other grounds by Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017 (4th Cir.1993), as support. In *Reinking,* the insured sought coverage from her medical insurer for more than thirty self-inflicted stab wounds suffered during a suicide attempt. The experts testified that at the time she stabbed herself, Reinking was out of touch with reality; not capable of rational thoughts; "suffered 'from a mental disorder, major depression, ... severe without psychotic features'"; and that her "judgment was grossly impaired from severe mental depression." *Id.* at 1217. The insurer's expert testified, however, that Reinking was capable of rational thought, and from this the insurer argued that Reinking was not insane but acted rationally if she could formulate and partially execute the suicide plan. *Id.*

The Fourth Circuit Court of Appeals affirmed the trial court's finding that Reinking was incapable of acting intentionally or resisting an impulse to act. *Id.* *Reinking* might be relevant to the question of Brown's derangement, but unlike Reinking, no substantial evidence revealed that Brown was delusional, acted from an "insane impulse," was out of touch with reality, or even that he behaved irrationally in any other facet of his life.

In sum, the evidence did not support the conclusion that Brown met either prong of the *Globe* test. Accordingly, Judge Udall did not abuse his discretion in finding that the evidence did not support a finding that Brown lacked intent under the *Globe* test.

**D. State Farm's Foundational Objection to Dr. Mazen's Testimony**

Judge Udall, in granting the new trial, found that Judge Marquardt erred in overruling State Farm's objections to Dr. Mazen's expertise as a "forensic" psychologist.[14] In light of our resolution of the final issue in this appeal, we need not address this argument.

**II. STATE FARM'S CROSS–APPEAL FROM DENIAL OF ITS MOTION FOR JUDGMENT**

**A. No Reasonable Trier of Fact Could Conclude Brown Satisfied the *Globe* Test**

State Farm cross-appeals from the grant of a new trial and contends that Judge Udall erred in not entering judgment in its favor. For all of the reasons stated above, it is our opinion that no reasonable trier of fact could conclude from the evidence that Brown's mental state "so overmastered his will as to disable him from acting rationally." *Eymann,* 166 Ariz. at 353, 802 P.2d at 1052. Therefore, State Farm is entitled to judgment in its favor. *Id.*

Dr. Mazen's testimony was simply insufficient to demonstrate that Brown suffered a derangement of the intellect which deprived him of the capacity to act in accordance with reason. Although Dr. Mazen thought that Brown's mental condition was "highly impaired" and considered the terms "deprived" and "impaired" to be synonymous, this is insufficient to meet the *Globe* standard; there must be credible evidence that the insured was truly deprived of the ability to govern his or her actions in a rational man-

14. Dr. Mazen attempted to determine Brown's state of mind at the time of the molestations and testified that he relied upon Brown's own statements and psychological test results; he did not seek or consider Brown's statements to other therapists or statements made by the victim, her mother, Brown's ex-wife, or others who observed him.

ner. *Id.* at 352–53, 802 P.2d at 1051–52. No such evidence was presented in this case.

Moreover, no reasonable evidence demonstrated that Brown acted on an irresistible impulse. Stress may have weakened his judgment, reasoning, and normal inhibitions over his sexual behavior, but no one testified that stress caused him to molest this child. No evidence suggested that the molestations were anything other than planned events. If the mind planning those events was not deranged, the events were intended acts.

## B. The Role of Public Policy

Defendants argue that public policy favors compensation for victims and injured persons and supports Judge Marquardt's finding of insurance coverage for Brown's acts. We note that recognized public policy of this state also precludes indemnity for a person's own wrongdoing. *Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 356, 694 P.2d 181, 186 (1984) (intentional act exclusion furthers this policy by preventing an insured from acting wrongfully while secure in the knowledge that his insurer will pay the damages). *Id.* Here, insufficient evidence supported a conclusion that Brown was deprived of the ability to govern his conduct with reason; his own expert testified that he appreciated the wrongfulness of his acts, and certainly one could view the pacts of secrecy as an attempt to hide their wrongfulness.

In light of Dr. Mazen's testimony that Brown's actions were typical of a child molester, we find that the intentional act exclusion precludes coverage. Our courts have already determined that purposeful child molestation is not covered by insurance. *See State Farm Fire and Cas. Co. v. Doe*, 165 Ariz. 179, 180–81, 797 P.2d 718, 719–20 (App. 1990) (public policy mandates no coverage for intentional child molestation); *Twin City Fire Ins. Co. v. Doe*, 163 Ariz. 388, 390, 788 P.2d 121, 123 (App.1989) (a basic intent to injure is presumed from the tort of child molestation; public policy weighs against insurance coverage).

## CONCLUSION

No reasonable finder of fact could conclude from the evidence in this case that Brown lacked intent under the *Globe* standard. Thus, Judge Udall did not abuse his discretion in granting a new trial. On this record, however, we conclude that he should have taken the next step and entered judgment in State Farm's favor. Accordingly, we reverse the trial court's decision and remand this matter with instructions to enter judgment in favor of State Farm.

VOSS, J., concurs.

GERBER, Presiding Judge, specially concurring.

I write specially because, although I agree with the result and analysis, I feel some words are necessary regarding the conflict between the differing legal and psychological approaches to this and other cases.

In this case, before hearing any expert testimony, the original trial judge proclaimed that Brown's acts of molestation were irrational:

"It seems to me that molestation of a child is not an act committed with reason ... again, the molestation of the child was an ¨irrational course of conduct ... to me at least that's clear. It was an impulse, and I think we have here—a series of impulses that took place."

Taken literally, the judge's comment precludes any and all criminal convictions for child molestation as well as all intentional act exclusions in insurance policies. In a recent analogous case, *DePasquale v. Thrasher*, 890 P.2d 628 (1995), a child custody dispute, the trial judge announced before receiving any testimony that he would place custody wherever the psychologist recommended. We there held that the trial court erred in delegating judicial authority to the psychologist and changing custody without hearing evidence.

Both these cases reveal at a minimum unwarranted judicial deference to anticipated testimony from psychologists. It is one thing to hear testimony and weigh it afterwards; it is quite another for a judge to announce, before hearing any evidence, that he will believe and do whatever a psychologist recommends. Such an attitude is an

526

abdication of judicial responsibility under an assumption of psychological infallibility. Judges are neither rubber stamps nor acolytes for psychological experts or, indeed, for any other expert.

Part of this unwarranted judicial deference to psychologists stems in the instant case from misperceiving the foundational difference between legal and medical approaches to human behavior. These analyses differ in their presuppositions and methods. While both seek to understand and shape behavior, the legal system approaches behavior in terms of moral judgment, whereas medical science generally approaches behavior in a scientific, judgment-neutral, empirical context. The legal model's postulate of free will envisions people as morally and legally answerable for their conduct rather than as pigeons in a Skinner box. By contrast, the scientific model in most schools of psychology is largely deterministic: behavior results from causal antecedents like "impulses", so that legal responsibility becomes irrelevant at best, an abstraction at worst. From Freud to Skinner this approach implies that behavior generally is explainable in terms of cause ("stimulus") and effect ("response"), a proposition contrary to the legal postulate that people are accountable for conduct because they can ordinarily control it.

The psychologization of responsibility makes responsibility scientifically irrelevant because it cannot be reduced to observable causes. In this view, human behavior results from predictable, discoverable antecedents in one's genes, upbringing, or outside environment. Responsibility disappears in the throng of what this trial judge called "impulses" supposedly controlling conduct; beset by "impulses," we become a "nation of victims," as a current best-seller puts it.

This methodological conflict obviously cannot be resolved here in one case, but it is a topic which deserves serious attention by those concerned about the latent tensions between the legal and psychological postulates about human behavior. Some softening of the positions of each may help to accommodate the other. One place to begin, as Dr. Esplin fleetingly suggests in his testimony here, is that since most impulses are man-

ageable, the general proposition that impulses eviscerate responsibility is simply false in the legal arena.

In the meantime, a judge abdicates judicial responsibility by capitulating to behavioral determinism or to the testimony or philosophy of any expert before it is even heard.