FARM BUREAU INSURANCE COMPANY OF NEBRASKA, APPELLANT, v. IRMA WITTE, APPELLEE, AND JENNIFER JOY BORGMEYER, INDIVIDUALLY, AND ALEXANDER ERIC WITTE, BY HIS GUARDIAN AND NEXT BEST FRIEND, JENNIFER JOY BORGMEYER, INTERVENORS-APPELLEES.

594 N.W. 2d 574

Filed May 14, 1999. No. S-98-297.

Gary J. Nedved, of Keating, O'Gara, Davis & Nedved, P.C., for appellant.

Patrick M. Flood, of Hotz & Weaver, for intervenors-appellees.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

### NATURE OF CASE

Appellant, Farm Bureau Insurance Company of Nebraska (Farm Bureau), filed a petition in the district court for Lancaster County seeking a declaratory judgment that the exclusionary clause in a policy of homeowner's insurance issued by Farm Bureau to appellee Irma Witte excluded coverage for damages she inflicted on Alexander Eric Witte, an infant child, by shaking him, causing shaken baby syndrome. The mother of Alexander, appellee Jennifer Joy Borgmeyer, intervened.

Farm Bureau moved for a directed verdict at the conclusion of the evidence. The trial court denied the motion. Thereafter, the jury determined that the exclusionary clause in the Farm Bureau policy did not exclude coverage under that policy. Judgment was entered accordingly. Farm Bureau appeals. We reverse the order of the district court denying Farm Bureau's motion for directed verdict and remand the cause to the district court with directions to vacate the judgment entered upon the

jury's verdict and to enter judgment granting Farm Bureau the relief specified in its amended petition for declaratory judgment.

## STATEMENT OF FACTS

*Injuries to Alexander.*

During the period of September through December 1994, Irma occasionally babysat her infant nephew, Alexander. Irma agreed to babysit Alexander on December 15, and Alexander's mother, Borgmeyer, brought Alexander to Irma's home at approximately 7 p.m. Irma had been in contact with Borgmeyer earlier that day. Borgmeyer sold "crank," or methamphetamine, to Irma, and the two women used the drug together. In addition to her methamphetamine consumption, Irma consumed at least two beers while she was caring for Alexander.

Irma testified that she felt depressed and frustrated that evening about her recently failed marriage and her use of alcohol and illegal drugs. At some point after her two young children were in bed, Irma was holding Alexander in her arms, trying to get him settled. Alexander was fussy and would not sleep. Irma shook Alexander. Although she readily admitted shaking Alexander, Irma testified at trial that she could not remember exactly how long she shook him and that she did not recall whether Alexander's head struck any hard surface during the shaking. Irma added, "I was frustrated, but not with Alex." Irma stated that she did not intend to harm the baby and that she was not thinking about him when she shook him.

Irma's ex-husband, Jim Witte, and his brother, Eric Witte, Alexander's father, arrived at Irma's home at about midnight. Jim and Eric fixed a snack to eat, and they watched television. Irma dressed Alexander in his snowsuit and placed him in his car seat. Eric left with Alexander at approximately 1 or 1:30 a.m.

The record does not reveal Alexander's condition when he left Irma's home. The trial evidence indicates, however, that Alexander's parents sought medical care for him soon after retrieving him from Irma's care. Alexander was admitted to Children's Hospital in Omaha on December 16, 1994.

Dr. Fred Kader, a pediatric neurologist, examined and treated Alexander in the hospital. Dr. Kader diagnosed Alexander with

"neurological difficulties as a result of having child abuse from a significant closed head injury and trauma due to shaken baby syndrome." Dr. Kader described shaken baby syndrome as "a constellation of findings in a child who has evidence of neurological deficit," including, inter alia, evidence of retinal hemorrhages and bleeding within the brain or between the brain tissue and the bone of the skull. Dr. Kader found that Alexander had evidence of seizures, intercranial and retinal hemorrhages, and neurological depression, all of which had occurred within 24 hours of Dr. Kader's examination of Alexander on December 16, 1994. Dr. Kader found that Alexander had sustained a skull fracture injury on the right side of his brain which had occurred within 24 hours of Dr. Kader's examination. It was uncontroverted that as described above, Irma had cared for Alexander during part of that 24-hour period. Other than Irma's admitted shaking of Alexander, there was no trial evidence of any event which could have caused Alexander's injuries.

According to Dr. Kader, many but not all infants afflicted with shaken baby syndrome show associated direct evidence of trauma, such as a skull fracture or a focal contusion under the site of a blow to the child's head. Dr. Kader testified that skull fractures on an infant cannot be caused by shaking the baby and that in order for a skull fracture to occur, the child's skull must come into contact with a hard surface or object. Dr. Kader testified that although he could diagnose shaken baby syndrome, he could not state whether the injury was a result of intentional conduct by another person.

In addition to the new head injuries to the right side of Alexander's brain described above, in Dr. Kader's examination of Alexander, Dr. Kader also found that Alexander had lesions on the left side of his brain. Unlike the fracture on the right side of Alexander's brain which was recent in origin, Dr. Kader stated that the lesions on the left side of Alexander's brain were several days to 1 week old and that these lesions were healing. Dr. Kader opined that "there were possibly multiple reasons" for the lesions on the left side of Alexander's brain, including shaking or a more significant direct contusion to that part of Alexander's brain. Dr. Kader testified that in diagnosing

Alexander with the cluster of symptoms he referred to as "shaken baby syndrome," he included both the new injuries to the right side of Alexander's brain as well as the healing injuries to the left side of Alexander's brain. Dr. Kader noted that the fracture injury to the right side of Alexander's brain affected the left side of Alexander's brain in "the subsequent evolution of the event." Dr. Kader testified that if a child was already suffering from an underlying brain injury which was drawing upon the neurological reserves in the child's body in order to heal, a subsequent brain injury to the child could be caused by an impact of less force than that which caused the first injury, because the child's neurological resources would already be taxed by healing the preexisting injury.

Irma was interviewed by Nebraska State Patrol Investigator Michael Malmstrom on December 16, 1994, at Children's Hospital, where she had gone to see Alexander. Irma fabricated three different versions of how Alexander's injuries occurred before telling Malmstrom the truth. Irma admitted that she had shaken Alexander and that she had consumed alcohol and used methamphetamine on December 15 in the hours before she shook Alexander.

*Issues Framed in Declaratory Judgment Proceeding.*

Farm Bureau filed a petition for declaratory judgment against Irma on November 26, 1996. The petition was subsequently amended, and Farm Bureau filed its final amended petition on February 23, 1998, the first day of trial in this case. In its amended petition, Farm Bureau alleged that it issued a policy of homeowner's insurance to Irma and Jim which was in effect on December 15, 1994, the date upon which Irma admitted shaking Alexander.

The Farm Bureau policy was admitted in evidence at trial as exhibit 8. It contained the following pertinent provisions:

SECTION 2 — LIABILITY COVERAGES
COVERAGE G
PERSONAL LIABILITY

If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** or **prop-**

**erty damage** caused by an **occurrence** to which this coverage applies, we will:

a. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

b. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

. . . .

EXCLUSIONS — SECTION 2

1. Coverage G-Personal Liability, Coverage H-Medical Payments to Others, Coverage I-Watercraft Liability, and Coverage J-Watercraft Medical do not apply to **bodily injury** or **property damage**:

a. which is expected or intended by any **insured**.

(Emphasis in original.)

The Farm Bureau policy defined "bodily injury" as "bodily harm, sickness or disease, including required care, loss of services and death resulting therefrom." The policy defined "occurrence" as "an accident and includes exposure to conditions which result in **bodily injury** or **property damage** during the policy period, provided the cause is accidental." The terms "accident" and "accidental" were not defined in the policy.

In its amended petition for declaratory judgment, Farm Bureau alleged that Irma "intentionally, deliberately and willfully shook [Alexander] and struck his head against a hard object" and that Irma intended to injure Alexander when she shook him. Farm Bureau requested that the court adjudicate Farm Bureau's claim and declare that the homeowner's insurance policy issued by Farm Bureau to Irma and Jim "[did] not furnish any coverage with respect to the incident which occurred on December 15, 1994, resulting in injuries to Alexander Eric Witte." Irma did not file an answer to Farm Bureau's amended petition or to any pleadings or motions filed by Farm Bureau before trial. Irma testified as a witness at the trial, but she was not represented by counsel. Her trial partici-

pation was limited to her testimony as a witness called by Farm Bureau.

Borgmeyer was granted leave to intervene in Farm Bureau's declaratory judgment case on her own behalf and on Alexander's behalf as his guardian and "next best friend." In her amended petition in intervention filed on February 23, 1998, Borgmeyer alleged that she had filed a petition for damages against Irma in the district court for Dodge County and that therefore, she possessed an interest in the outcome of the declaratory judgment action commenced by Farm Bureau against Irma. A copy of Borgmeyer's petition for damages against Irma filed in Dodge County is not contained in the record on appeal. In her amended petition in intervention, Borgmeyer requested an affirmative declaration by the trial court that the homeowner's insurance policy issued by Farm Bureau to Irma and Jim furnished "coverage" with respect to Irma's conduct in shaking Alexander on December 15, 1994.

The trial court conducted a pretrial conference on September 25, 1997. Farm Bureau and Borgmeyer were represented by counsel at the pretrial conference. Irma was not present or represented by counsel at the pretrial conference. The pretrial order resulting from the pretrial conference is contained in the record on appeal. In the portion of the pretrial order pertaining to a statement of Farm Bureau's trial issues, the pretrial order refers to Farm Bureau's pretrial memorandum, in which Farm Bureau stated that "there is no coverage under the Farm Bureau policy because there was no 'occurrence' as that term is defined in the policy and for the further reason [that] the coverage is specifically excluded for bodily injury or property damage 'which is expected or intended . . . .' " Pursuant to the "Pretrial Order," Farm Bureau claimed that the controverted issues of fact and law were whether Alexander's injuries were the result of an "accident," as that term was used in the Farm Bureau policy, and whether coverage for Borgmeyer's claim against Irma was excluded because Irma expected or intended to injure Alexander. At oral argument, counsel for Farm Bureau stated that it raised no issue on appeal regarding whether the shaking was or was not an "accident." On appeal, Farm Bureau argues

only that coverage is excluded because the bodily injury was expected or intended.

### Trial and Presentation of Case to Jury.

A jury trial was conducted February 23 through 25, 1998. The Farm Bureau homeowner's insurance policy issued to Irma and Jim was received in evidence without objection. Dr. Kader's testimony regarding Alexander's diagnosis and condition was introduced by deposition. Irma testified live at the trial, as did Malmstrom and Borgmeyer. Borgmeyer's testimony was essentially limited to a description of Alexander as a well child before December 15, 1994, and foundation for a videotape showing Alexander less than 1 week before the incident.

Irma admitted that when Malmstrom first questioned her about Alexander's injuries, she lied about shaking Alexander. Irma admitted that she shook Alexander and stated that she could not remember how long she did so or whether Alexander struck his head against a hard surface or object while she was shaking him. Irma denied that she had shaken or abused Alexander at any other time, and she denied that she had ever shaken or abused her own two young children. Irma testified that she did not know how Alexander received the healing lesions which Dr. Kader detected on the left side of Alexander's brain.

The trial court allowed the parties to inform the jury that Borgmeyer had filed a "claim" for damages against Irma based on Alexander's injuries, but the court did not allow the parties to introduce evidence of the separate petition for damages Borgmeyer had filed against Irma in the district court for Dodge County.

The trial court also refused to allow specific evidence of the nature and scope of Alexander's injuries. The court did, however, allow the jury to view a silent videotape of Borgmeyer playing with and feeding Alexander on December 12, 1994, less than 1 week before Irma shook Alexander.

At the close of Farm Bureau's presentation of evidence, Borgmeyer moved the court for a directed verdict on the basis that Farm Bureau had failed to prove, as a matter of law, that

Irma intentionally injured Alexander. The trial court denied Borgmeyer's motion.

After Borgmeyer completed the presentation of her evidence, Farm Bureau moved for a directed verdict and for the court "to find as a matter of law that the exclusion to the insurance policy is applicable in this case and precludes coverage because the insured's act was of a character that an intention to inflict an injury can be inferred as a matter of law." The trial court denied Farm Bureau's motion for directed verdict. The case was submitted to the jury.

The jury rendered its verdict on February 25, 1998. Using a typed, prepared verdict form signed and dated by the jury foreperson, the jury stated that it "[does] find in favor of defendant and intervenor finding that the insurance policy does furnish coverage for injuries to Alexander Witte." Judgment was entered thereon. Farm Bureau appeals.

## ASSIGNMENTS OF ERROR

Farm Bureau claims on appeal that the trial court erred in denying Farm Bureau's motion for directed verdict and in failing to conclude that the character of Irma's act was such that her intent to inflict injury on Alexander could be inferred as a matter of law.

## STANDARD OF REVIEW

The interpretation and construction of an insurance contract or policy involve questions of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below. *Shivvers v. American Family Ins. Co., ante* p. 159, 589 N.W.2d 129 (1999).

In reviewing the action of a trial court, an appellate court must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. The party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Haag v. Bongers, ante* p. 170, 589 N.W.2d 318 (1999).

## ANALYSIS

*Nebraska Insurance Law Regarding Exclusions*
*for Intentional Acts.*

A policy of insurance is a contract. Parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract if the restrictions and conditions are not inconsistent with public policy or statute. *Shivvers v. American Family Ins. Co., supra.*

An insurer's duties to its insured are defined and governed by the terms of the insurance policy. See *Allied Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 243 Neb. 779, 502 N.W.2d 484 (1993). An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, they are to be accorded their plain and ordinary meaning. *Economy Preferred Ins. Co. v. Mass*, 242 Neb. 842, 497 N.W.2d 6 (1993).

Coverage under an insurance policy or contract is generally understood to consist of two separate and distinct obligations: the duty to defend any suit filed against the insured party and the duty to pay, on behalf of the insured, sums for which the insured shall become legally obligated to pay because of injury caused to a third party by acts of the insured. See, *John Markel Ford v. Auto-Owners Ins. Co.*, 249 Neb. 286, 543 N.W.2d 173 (1996); *Allstate Ins. Co. v. Novak*, 210 Neb. 184, 313 N.W.2d 636 (1981). The coverage issue in the instant case is of the latter variety.

Under Nebraska law, the burden to prove that an exclusionary clause applies rests upon the insurer. *Economy Preferred Ins. Co. v. Mass, supra.* An insurer may petition a court to declare, pursuant to Neb. Rev. Stat. § 25-21,149 (Reissue 1995) of Nebraska's Uniform Declaratory Judgments Act, whether an insured's conduct or a specific event is excluded from coverage under a policy of insurance. See, *Columbia Nat. Ins. v. Pacesetter Homes*, 248 Neb. 1, 532 N.W.2d 1 (1995); *State Farm Fire & Cas. Co. v. van Gorder*, 235 Neb. 355, 455 N.W.2d 543 (1990). A court may not enter declaratory judgment where there is an unknown potential for liability to an insured and the

declaratory judgment would not end the controversy between the parties, or where another equally serviceable remedy is available to the insurer. See, *Medical Protective Co. v. Schrein*, 255 Neb. 24, 582 N.W.2d 286 (1998); *Ryder Truck Rental v. Rollins*, 246 Neb. 250, 518 N.W.2d 124 (1994). Where it is proved, however, that a specific event or type of conduct is beyond the terms of an insurance policy, a court may enter a declaratory judgment that the insurer is not obligated to provide coverage to the insured for the event or conduct. See, *Columbia Nat. Ins. v. Pacesetter Homes, supra*; *State Farm Fire & Cas. Co. v. van Gorder, supra*; *State Farm Fire & Cas. Co. v. Victor*, 232 Neb. 942, 442 N.W.2d 880 (1989); *Bisgard v. Johnson*, 3 Neb. App. 198, 525 N.W.2d 225 (1994).

It is the law in Nebraska, generally, that where the event for which an insured seeks coverage is plainly outside the scope of the coverage encompassed in the policy according to a plain reading of its terms, an insurer may not be obligated to provide coverage to the insured. See, *State Farm Fire & Cas. Co. v. van Gorder, supra*; *State Farm Fire & Cas. Co. v. Victor, supra*; *Jones v. Norval*, 203 Neb. 549, 279 N.W.2d 388 (1979). In particular, an insured party's infliction of bodily harm upon another person may be deemed conduct from which an intent to injure can be inferred as a matter of law, regardless of the subjective intent of the insured party, and such conduct will not be covered under a policy which excludes coverage for " 'bodily injury . . . which is either expected or intended from the standpoint of the Insured.' " *Jones v. Norval*, 203 Neb. at 551, 279 N.W.2d at 392.

This court stated in *Jones v. Norval*, " 'The term "expected" when used in association with "intended" carries the connotation of a high degree of certainty or probability and seems to be used to practically equate with "intended," because one expects the consequences of what one intends.' " 203 Neb. at 552, 279 N.W.2d at 390, quoting *State Farm Fire & Cas. Co. v. Muth*, 190 Neb. 248, 207 N.W.2d 364 (1973). Relying on numerous cases not repeated here, in *Jones v. Norval, supra*, we stated that an injury is expected or intended from the standpoint of the insured if a reason for the insured's act is to inflict bodily injury or if the character of the act is such that an intention to inflict

an injury can be inferred as a matter of law. If an intentional act causes injuries which are the natural and probable consequences of the act, the injuries as well as the act itself may be deemed intentional. In *Jones v. Norval*, we stated:

> " 'Superficial analysis would suggest that this is an acceptance of the "natural consequences of the act" rule, but it is not. It is a much more narrow gauge that recognizes the correlation only where reason mandates that from the very nature of the act, harm to the injured party must have been intended. . . .' "

203 Neb. at 554, 279 N.W.2d at 391, quoting *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885 (Minn. 1978). See, also, *Home Ins. Co. v. Neilsen et al.*, 165 Ind. App. 445, 332 N.E.2d 240 (1975).

Examples of conduct relative to which this court has found that an insured's intent to injure another party may be inferred as a matter of law include battery by striking a third person in the face, using a closed fist, see *Jones v. Norval, supra*; killing a third person by intentionally aiming a gun and firing at him, see *State Farm Fire & Cas. Co. v. Victor, supra*; and sexual assault upon a minor child by an adult clergyman sexually molesting the victim, see *State Farm Fire & Cas. Co. v. van Gorder*, 235 Neb. 355, 455 N.W.2d 543 (1990). In each of these cases, we concluded that the insured's subjective intent to cause the resulting harm was immaterial, because as we have stated, the insured's act " 'is one which we recognize as an act so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm, and his statement to the contrary does nothing to refute that rule of law.' " *Jones v. Norval*, 203 Neb. at 554, 279 N.W.2d at 391 (quoting with approval *Clark v. Allstate Insurance Company*, 22 Ariz. App. 601, 529 P.2d 1195 (1975), *modified on other grounds, St. Paul Property & Liability v. Eymann*, 166 Ariz. 344, 802 P.2d 1043 (Ariz. App. 1990)).

*Exclusion of Coverage for Acts in This Case.*

In the case at bar, the homeowner's insurance policy issued by Farm Bureau to Irma and Jim expressly provided that bodily injury or property damage "which is expected or intended by

any **insured**" is not covered by the policy. Farm Bureau contended in the trial court, and argues on appeal, that Irma's conduct in shaking Alexander resulted in bodily injury expected or intended by the insured and that therefore, Irma's conduct and the harm resulting therefrom are not included in the coverage provided by the policy.

Whether bodily injury is expected or intended or whether the character of an act is such that an intention to inflict a bodily injury may be inferred as a matter of law in the act of an adult shaking a 7-month-old infant are questions of first impression in Nebraska. Farm Bureau maintains that the character of Irma's act was such that the trial court should have found as a matter of law not only that Irma intended to shake Alexander but that she intended to cause or should have expected to cause his injuries as well. Farm Bureau maintains that the trial court erred in denying Farm Bureau's motion for directed verdict. As noted above, Irma admitted that on December 15, 1994, she shook Alexander, although she denied that she intended to harm him and that she had shaken or struck Alexander in the past. Borgmeyer maintains that Irma's emotional state on December 15 and Irma's inability to completely recall the shaking incident preclude a finding that Irma intended or expected to cause bodily harm as a matter of law. On the facts of this case, we can say as a matter of law that Irma's act was so certain to cause the particular harm which ensued that we conclude that by performing the act of shaking Alexander, Irma intended the resulting harm, and coverage for the damages inflicted by her is excluded under the policy.

The following colloquy between Irma and Farm Bureau's counsel at trial provides a portion of the factual basis surrounding the coverage dispute in this case:

Q. You have an answer for Dr. Kader's testimony that this child's skull was fractured on December 15th?

. . . .

A. I don't remember. I remember that I shook him and I — I just — I don't remember anything too much about that night.

Q. Were you angry at Alexander Witte?

A. No.

Q. You weren't angry at him, but you shook him?
A. Yes.
Q. That's your testimony?
A. I was frustrated, but not at Alex. And — not at Alex at all.
Q. How long did you shake him?
A. A matter of seconds, I don't know.
Q. You heard Dr. Kader testify about the damage that he observed to Alexander Witte. And you're suggesting to this jury that this happened with just a couple of seconds of shaking?
A. I don't know how long I did it. I don't.
Q. Why did you do it?
A. I was frustrated and depressed.
Q. Is that an excuse for doing what you did to the baby?
A. No — no.
Q. Is there any excuse for what you did to that baby?
A. No.

Based on all the trial testimony, we note that although Irma testified that she was "frustrated and depressed" when she shook Alexander, she offered no evidence at trial that her psychological or mental status was so compromised that she could not make a meaningful choice about how to handle Alexander or that she could not or did not comprehend the grave nature of her actions and the likelihood of causing harm to Alexander by shaking him.

In this regard, we note that this court has held that although an insured may suffer from a diagnosed mental illness, symptoms of which may negate the insured's ability to form the requisite intent for culpability in a criminal prosecution, the insured may still commit an act from which an intent to harm may be inferred as a matter of law in a civil action. In *Economy Preferred Ins. Co. v. Mass*, 242 Neb. 842, 497 N.W.2d 6 (1993), the insured murdered his father with a rifle, and shot and wounded his father's friend. Although the insured was determined to be not competent to stand trial for the crimes of killing his father and assaulting his father's friend, this court determined that the insured's conduct was, as a matter of law, an intentional act which was excluded from coverage under his

policy of homeowner's insurance because the insured was aware of what he was doing and he intended the resulting injuries.

Other courts which have examined the question of whether an insured's emotional distress can negate his or her capacity to commit an intentional act as a matter of law, thereby precluding exclusion, have evaluated this claim largely on the evidence of the nature and scope of the mental disability claimed by the insured, much as we did in *Economy Preferred Ins. Co. v. Mass, supra.* For example, in *Allied Mutual Ins. Co. v. Costello*, 557 N.W.2d 284 (Iowa 1996), Costello, the insured, aggressively assaulted his secretary. The Iowa Supreme Court concluded such an act was excluded from Costello's employer liability insurance coverage. In this case, Costello admitted striking the secretary, but claimed, " '[T]here's about five, seven minutes in there, maybe ten minutes or whatever that I just had completely come unglued. I just lost it. I don't — it's a bad situation, and I was wrong.' " 557 N.W.2d at 285. Notwithstanding his admitted wrongdoing, Costello claimed his act was not excluded. Costello maintained that his act could not be considered intentional as a matter of law because, " 'I don't really remember very much.' " *Id.* Costello introduced evidence from mental health professionals who testified that Costello was depressed; that Costello's self-control was " 'diminished,' " *id.*, when he committed the assault; and that it was a one-time occurrence rather than an episode in a pattern of such assaults. Only Costello testified that he neither understood nor intended to commit the assault.

The *Costello* court held that Costello's act and the harm resulting therefrom were intentional as a matter of law and that therefore, there was no coverage, stating:

> We are satisfied that Costello is not mentally ill, only that he experienced difficulty controlling his temper. Whatever superficial attraction there is to be found in Costello's theory, it is derived from his bizarre behavior. His assault could scarcely be considered rational, but it does not follow that it was unintentional. Costello showed only that his anger was so strong as to prompt him to his conduct. We are however unpersuaded that the anger caused a lack

of understanding on his part. His elevated anger seems rather to have elevated his intent.

557 N.W.2d at 288.

Like the *Costello* court, we find in the instant case that there is no evidence in the record that establishes that Irma was incapable of understanding the nature of her act of shaking Alexander, that she was genuinely unable to formulate the intent to shake Alexander, or that she failed to understand that her act would cause the particular harm which resulted. Under the facts of this case, Irma's act of shaking Alexander " 'is one which we recognize as an act so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm, and [her] statement to the contrary does nothing to refute that rule of law.' " *Jones v. Norval*, 203 Neb. 549, 554, 279 N.W.2d 388, 391 (1979). In this connection, we note that other courts have rejected insureds' arguments that various acts such as molestations and assaults on minor children were not intentional as a matter of law because of the insureds' alleged diminished capacities or uncontrollable urges due to pedophilia, melancholia, or other mental disorders. See, *J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009, 804 P.2d 689, 278 Cal. Rptr. 64 (1991), *cert. denied* 502 U.S. 902, 112 S. Ct. 280, 116 L. Ed. 2d 232; *Allstate Ins. Co. v. Troelstrup*, 789 P.2d 415 (Colo. 1990); *L.M. v. J.P.M.*, 714 So. 2d 809 (La. App. 1998), *writ denied* 725 So. 2d 487 (La. 1998); *United Services Auto. Ass'n v. Marburg*, 46 Conn. App. 99, 698 A.2d 914 (1997).

In an attempt to prevent a declaration that Irma's act and the harm resulting therefrom are intentional as a matter of law and thereby excluded from coverage, Borgmeyer directs us to *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998). *State v. Parks* is inapposite. *State v. Parks* is a criminal prosecution for child abuse, in violation of Neb. Rev. Stat. § 28-707(1) (Reissue 1995). In *State v. Parks, supra*, Parks, while changing his infant son's diaper, admitted that he abruptly rolled the baby over in the crib, resulting in a spiral fracture of the baby's femur. Parks claimed in the criminal prosecution that his act was negligently, not intentionally, committed during an argument with the baby's mother. The trial court submitted the case to the jury on

the theory that Parks had " 'cruelly punished' " the baby. *Id.* at 943, 573 N.W.2d at 457. The court refused Parks' request to have the jury instructed on negligent child abuse and instead instructed the jury only on intentional child abuse. On appeal, we held that negligent child abuse is a lesser-included offense of intentional child abuse and that given the evidence in *State v. Parks*, the jury could have concluded that the abuse occurred as a result of negligence rather than an intentional act.

The analysis in *State v. Parks* does not control our determination of the issues in this case. *State v. Parks* is a criminal case, in which there is a different, higher standard of proof than in the civil case sub judice. Further, the issues in the cases are not the same. The act of changing a diaper is an innocent act and is not ordinarily harmful, whereas an adult's shaking of a baby has no innocent purpose, and the harm therefrom is obvious. While Parks, like Irma in the instant case, admitted abusing the baby, Parks claimed no loss of memory of the event or other mental condition that purportedly precluded his intent to commit the harmful actions, as Irma and Borgmeyer claim in the case at bar.

Other courts which have examined civil cases involving the shaking of an infant or young child have determined that presented with adequate evidence, an insured's intent to injure may be inferred as a matter of law from the shaking of an infant or a young child, regardless of the insured's subjective intent. See, e.g., *Allstate Ins. Co. v. Davis*, 6 F. Supp. 2d 992 (S.D. Ind. 1998) (holding in coverage case that actions of babysitter who caused infant's death by bouncing child repeatedly on her knee, causing acceleration-deceleration injury which generated concussion and subdural hematoma, were not "accident" as matter of law); *American Family Mut. Ins. Co. v. De Groot*, 543 N.W.2d 870 (Iowa 1996) (holding in farm liability policy coverage case that repetitious nature of babysitter's act in striking infant's head on floor three times supported inference that babysitter's actions were intentional). See, also, *Smith v. Estrade*, 589 So. 2d 1158 (La. App. 1991) (holding that father's excessive shaking of daughter in automobile was intentional, not negligent, act excluded from automobile liability insurance coverage because, inter alia, act was not within foreseeable use of automobile).

An appellate court treats a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. A directed verdict is proper at the close of all evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. *Haag v. Bongers, ante* p. 170, 589 N.W.2d 318 (1999).

We conclude that Farm Bureau was entitled to a directed verdict in its favor. On this record, Irma admittedly shook Alexander, and his resulting bodily injuries were expected or intended as a matter of law. We, therefore, reverse the order of the trial court denying Farm Bureau's motion for directed verdict and remand the cause to the district court with directions to vacate the judgment entered in favor of Irma and Borgmeyer and to enter judgment on Farm Bureau's amended petition for declaratory judgment consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

HENDRY, C.J., not participating.