GERALD R. KIRWAN, JR., AND LEONA KIRWAN, HUSBAND AND
WIFE, APPELLANTS AND CROSS-APPELLEES, V. CHICAGO TITLE
INSURANCE COMPANY, APPELLEE AND CROSS-APPELLANT.

612 N.W. 2d 515

Filed June 20, 2000.   No. A-99-498.

David A. Domina and Nora M. Kane, of Domina Law, P.C.,
for appellants.

Richard J. Butler and Derrick J. Hahn, of Butler, Galter &
O'Brien Law Firm, for appellee.

IRWIN, Chief Judge, and SIEVERS and MOORE, Judges.

SIEVERS, Judge.

Gerald R. Kirwan, Jr., and Leona Kirwan (the Kirwans)
brought this action against their title insurer, Chicago Title
Insurance Company (Chicago Title), to recover attorney fees
they incurred in successfully defending a suit involving the
insured property, which is in South Dakota. Each party moved
for summary judgment. The Holt County District Court granted

Chicago Title's motion for summary judgment, finding that the Kirwans learned of the adverse claim to their property after the title insurance commitment was issued but before the policy was issued and that because the Kirwans did not disclose the claim to Chicago Title as required, coverage was precluded.

## BACKGROUND

This case arises from a suit filed in South Dakota in which David Vanderwerf (David) and his parents, Harry and Betty Vanderwerf, asserted an adverse claim against a South Dakota ranch which the Kirwans had purchased.

*South Dakota Litigation.*

In March 1991, Robert and Eva Matthews (the Matthewses) conveyed property to the Kirwan Ranch, a South Dakota partnership, and David as tenants in common, for the purchase price of $192,000. The general partners of the Kirwan Ranch were James T. Kirwan (James); his spouse, Shirley; and their sons James P. Kirwan and William P. Kirwan. The partners and David executed a mortgage to the Matthewses for $123,000. In addition, Harry, Betty, and David provided a total of $83,300. Harry and Betty requested that only David's name appear on the deed. David was obligated to pay his share of the mortgage to the Matthewses.

From 1993 to 1995, the partners experienced financial difficulties. In an attempt to alleviate this situation, James asked an attorney to prepare a quitclaim deed from David to the partners. On September 6, 1995, William, on behalf of the partners, asked David to execute the quitclaim deed. David was told that the deed was not going to be recorded, but would be used as security for a loan from a Yankton bank. (It was later learned that the Yankton bank had made no such request.) David was told that when the partners received the loan money, they would buy out David's interest in the land. David immediately signed the quitclaim deed, and without his knowledge, it was recorded that same day, on September 6, 1995.

The partners, without David's knowledge, entered into a contract to sell the property to the Kirwans (Gerald Kirwan is James' first cousin). The contract was executed, and the deed

was signed on December 12, 1995. The Kirwans' mortgage was ultimately through First Trust National Association (First Trust). Chicago Title issued a title commitment to the Kirwans, which became effective on April 1, 1996. A title insurance policy from Chicago Title, which became effective on May 16, 1996, was ultimately issued to the Kirwans. The deed to the Kirwans for the property was recorded on April 15, 1996. The Kirwans did not have any notice of the arrangement between David and the partners when the Kirwans entered into the agreement. David learned of the contract to sell the property to the Kirwans about 2 months after he signed the quitclaim deed.

On April 5, 1996, the Vanderwerfs' lawyer wrote a letter to Gerald Kirwan, stating David's claims to the property. It arrived on April 7 or 8, 1996, 1 week after closing and 4 months after the contract was recorded. In the letter, a lawsuit was threatened to enforce the Vanderwerfs' rights in the property. This was the first notice the Kirwans had of the Vanderwerfs' claim.

On May 16, 1996, the Vanderwerfs brought suit against the partners, the Kirwans, and First Trust, to set aside the transfer and void claims to the property by the Kirwans and First Trust. That lawsuit ultimately went to the South Dakota Supreme Court, which found that the Kirwans were bona fide purchasers for value without notice and that First Trust was a mortgagee in good faith and for value, thereby rejecting the Vanderwerfs' claims. See *Vanderwerf v. Kirwan*, 1998 S.D. 119, 586 N.W.2d 858 (1998).

*Present Litigation Involving Chicago Title.*

When suit was filed by the Vanderwerfs, the Kirwans immediately contacted Chicago Title for defense of the claim. Chicago Title began representing the Kirwans as well as their lender, First Trust, as a policy beneficiary. However, Chicago Title later withdrew its defense of the Kirwans. The Kirwans then hired their own legal counsel and successfully defended the Vanderwerfs' suit, including the appeal.

Chicago Title's position is that it had no duty to defend because the Kirwans learned of the adverse claim after the commitment was issued and before the policy was issued, but the Kirwans failed to inform Chicago Title of the claim, which

results in preclusion of coverage for the Vanderwerf litigation. The Kirwans' attorney received the title commitment issued by Chicago Title on or about April 15, 1996. The title commitment had an effective date of April 1, 1996, and it included "Conditions and Stipulations" as follows:

> If the proposed Insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment . . . and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge.

The Kirwans' title insurance policy from Chicago Title, which became effective on May 16, 1996, contains the following provision in the "Exclusions from Coverage" section:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
>
> . . . .
>
> 3. Defects, liens, encumbrances, adverse claims or other matters:
>
> . . . .
>
> (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy[.]

The South Dakota Supreme Court's opinion stated that the Kirwans learned of the Vanderwerfs' claim on April 7 or 8, 1996, while the Kirwans' belief was that only after closing on April 9, 1996, did they learn of the Vanderwerfs' claim. Nonetheless, the Kirwans admit that neither they nor their attorney disclosed the Vanderwerfs' title claim to Chicago Title between April 9, 1996, and when the suit was filed 40 days later. Chicago Title learned of the claim on or about June 21, 1996, when the Kirwans' attorney forwarded a copy of the

Vanderwerfs' lawsuit to an agent of Chicago Title to tender defense of the action. As earlier stated, Chicago Title defended for a time, but withdrew, and the Kirwans completed the defense on their own—the basis for the recovery sought herein.

The Kirwans filed suit in the Holt County District Court against Chicago Title to recover their defense costs. Each side filed motions for summary judgment. The district court granted Chicago Title's motion for summary judgment and denied the Kirwans' motion. The district court found that the Kirwans did not have to reimburse Chicago Title for its expenses associated with defending the Kirwans' lender, First Trust. The court also awarded Chicago Title $3,664.38 for legal fees spent to defend the Kirwans before withdrawing its defense of the suit.

The Kirwans appeal the district court's entry of summary judgment in favor of Chicago Title, and Chicago Title cross-appeals the denial of an award for attorney fees it incurred in defending First Trust.

## ASSIGNMENTS OF ERROR

The Kirwans assert, restated, that the district court erred in granting summary judgment in favor of Chicago Title and denying the Kirwans' motion for partial summary judgment. Chicago Title cross-appeals, asserting that the district court erred in failing to award Chicago Title attorney fees incurred in the defense of First Trust in the Vanderwerf litigation.

## STANDARD OF REVIEW

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Knudsen v. Mutual of Omaha Ins. Co.*, 257 Neb. 912, 601 N.W.2d 725 (1999). In reviewing an order of summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Knudsen v. Mutual of Omaha Ins. Co., supra.*

Although the denial of a motion for summary judgment, standing alone, is not a final, appealable order, when adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over all motions and may determine the controversy which is the subject of those motions or make an order specifying the facts which appear without substantial controversy and direct further proceedings as it deems just. *Shivvers v. American Family Ins. Co.*, 256 Neb. 159, 589 N.W.2d 129 (1999); *American Family Ins. Group v. Hemenway*, 254 Neb. 134, 575 N.W.2d 143 (1998).

The interpretation and construction of an insurance contract or policy involve questions of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below. *Shivvers v. American Family Ins. Co., supra; American Family Ins. Group v. Hemenway, supra; Moller v. State Farm Mut. Auto. Ins. Co.*, 252 Neb. 722, 566 N.W.2d 382 (1997).

## ANALYSIS

*Full Faith and Credit to South Dakota Decision.*

The decision of the South Dakota Supreme Court in *Vanderwerf v. Kirwan*, 1998 S.D. 119, 586 N.W.2d 858 (1998), is entitled to full faith and credit because a judgment of a state court which had jurisdiction is to be given full faith and credit. See *Gruenewald v. Waara*, 229 Neb. 619, 428 N.W.2d 210 (1988) (sister state's judgment has same validity and effect in this state as in state rendered). The U.S. Constitution prohibits a Nebraska court from reviewing the merits of a judgment rendered in a sister state. *Walksalong v. Mackey*, 250 Neb. 202, 549 N.W.2d 384 (1996). South Dakota's jurisdiction in the action brought by the Vanderwerfs has not been challenged, nor do the parties here dispute that the factual issues in the South Dakota case were determined by appropriate legal procedure.

*Choice of Law.*

The Kirwans assert that because the land in question was in South Dakota, the policy was issued in South Dakota, and the Vanderwerfs' lawsuit was filed and tried in South Dakota, the

insurance policy is governed by and construed according to South Dakota law.

■ The rights and duties of contracting parties are governed by the law of the state with the most significant relationship to the transaction and the parties. *Powell v. American Charter Fed. Sav. & Loan Assn.*, 245 Neb. 551, 514 N.W.2d 326 (1994) (adopting approach set forth in Restatement (Second) of Conflict of Laws § 188 (1971) in dealing with conflict of laws in contract actions to determine which law to apply). "The relevant principles a court should consider are the place of the contracting, the place of any negotiations which occurred, the place of performance, the location of the subject matter, and the domicil[e] or residence of the parties." 245 Neb. at 556-67, 514 N.W.2d at 331. These principles in *Powell* are from the Restatement (Second), *supra*, § 188.

Applying these principles to the present case, we readily conclude that South Dakota is the state with the most significant relationship to the transaction and the parties. The parties did not make a choice of law in either the title commitment or the policy (although the arbitration clause in the title insurance policy mandates that the law of the situs of the land applies to arbitration). The contracts for the land sale and the title insurance were made in South Dakota. The record shows that both the title commitment and title insurance policy were issued by Chicago Title's agent, Gregory County Abstract Company of Burke, South Dakota.

■ On the other hand, Nebraska has little to do with the title insurance contract, except that the Kirwans are residents of Nebraska and that Chicago Title delivered the title insurance policy to the Kirwans in Holt County, Nebraska. We find that these minor connections to Nebraska do not outweigh the substantial connections to South Dakota. Therefore, we apply South Dakota law to the construction of the title commitment and title insurance policy concerning the rights and obligations of the Kirwans and Chicago Title. However, since procedural matters are dictated by the law of the forum, Nebraska law still governs all other aspects of this case. See *Whitten v. Whitten*, 250 Neb. 210, 548 N.W.2d 338 (1996) (although substantive rights of parties to action are governed by state where cause of action arose,

procedural matters are dictated by law of forum). See, also, *Calvert v. Roberts Dairy Co.*, 242 Neb. 664, 496 N.W.2d 491 (1993). The standard of review to apply in a trial court's summary judgment and whether a party is entitled to summary judgment is a matter of procedure controlled by the law of the forum. See *Shilling v. Moore*, 249 Neb. 704, 545 N.W.2d 442 (1996).

The issues presented in this case surround the alleged conflict between the title commitment and title insurance policy and the exclusions contained therein regarding notice of adverse claims affecting the insureds' right to attorney fees. This precise issue has not been addressed by South Dakota, but we look to the general insurance and contract law of that state in rendering our decision in order to determine what the South Dakota Supreme Court would do if faced with this issue. We now turn to the merits.

*Granting Chicago Title's Motion for Summary Judgment.*

The trial court based its decision in favor of Chicago Title on its finding that the Kirwans learned of the adverse claims after the title commitment was issued, but did not notify Chicago Title before the policy was issued, which resulted in an exclusion from coverage of the Vanderwerfs' claim.

A policy of insurance is contractual in nature. See *State, Div. of Ins. v. Norwest Corp.*, 1998 S.D. 61, 581 N.W.2d 158 (1998). Parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract if the restrictions and conditions are not inconsistent with public policy or statute. *Farm Bureau Ins. Co. v. Witte*, 256 Neb. 919, 594 N.W.2d 574 (1999); *Shivvers v. American Family Ins. Co.*, 256 Neb. 159, 589 N.W.2d 129 (1999). See *Fort Pierre v. United Fire and Cas. Co.*, 463 N.W.2d 845 (S.D. 1990). An insurer's duties to its insured are defined and governed by the terms of the insurance policy. *Farm Bureau Ins. Co. v. Witte, supra*; *Allied Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 243 Neb. 779, 502 N.W.2d 484 (1993). An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. See *Kimball Investment Land, Ltd. v. Chmela*, 2000 S.D. 6, 604 N.W.2d 289 (2000).

Furthermore, there is a presumption that the parties to a contract know and understand its contents and that the contract embodies and expresses the true intention of the parties. *Farmland Ins. Companies v. Heitmann*, 498 N.W.2d 620 (S.D. 1993) (Henderson, J., dissenting), citing *Ryken v. Blumer*, 307 N.W.2d 865 (S.D. 1981).

Interpretation and construction principles are to be controlled by the same rules applicable to contracts generally. *Dairyland Ins. Co. v. Wyant*, 474 N.W.2d 514 (S.D. 1991). " 'As a matter of law insurance contracts should be construed like any other contract, giving effect to the expressed intentions of the parties so far as that intention is legal.' " *Id.* at 518. The test for governing interpretation and construction of a contract is to determine what a reasonable person in the position of the insured would have understood the words to mean. *Id.*

The South Dakota Supreme Court has stated that " '[a]n insurance contract's language must be construed according to its plain and ordinary meaning and a court cannot make a forced construction or a new contract for the parties.' " *Stene v. State Farm Mut. Auto. Ins. Co.*, 1998 S.D. 95, ¶ 14, 583 N.W.2d 399, 402 (1998), quoting *St. Paul Fire & Marine Ins. v. Schilling*, 520 N.W.2d 884 (S.D. 1994).

The scope of coverage of an insurance policy is determined from the contractual intent and the objectives of the parties as expressed in the contract. *St. Paul Fire & Marine Ins. v. Schilling, supra.* Therefore, the nature of the insurer's duty to defend is defined by the insurance policy as a contract. *Allied Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co., supra.* Although an insurer is obligated to defend all suits brought against the insured, even though groundless, false, or fraudulent, the insurer is not bound to defend a suit based on a claim outside the coverage of the policy. See, *Tri-State Co. of Minnesota v. Bollinger*, 476 N.W.2d 697 (S.D. 1991); *Hawkeye-Security Ins. Co. v. Clifford*, 366 N.W.2d 489 (S.D. 1985). The insurer bears the burden of showing that it has no duty to defend its insured, by showing that the claim clearly falls outside of the policy coverage. *State Farm Mut. Auto. Ins. Co. v. Wertz*, 540 N.W.2d 636 (S.D. 1995); *North Star Mut. Ins. Co. v. Kneen*, 484 N.W.2d 908 (S.D. 1992).

Chicago Title asserts that because the Kirwans did not disclose the adverse claims, as required by the title insurance commitment and the title insurance policy, the Vanderwerfs' litigation was outside the policy, and as a result, there was no duty to defend the Kirwans. Where an insurance policy is unambiguous, its terms are to be construed according to their plain and ordinary meaning. *Pete Lien & Sons v. First American Title*, 478 N.W.2d 824 (S.D. 1991).

The "Conditions and Stipulations" section of the title commitment provides:

> If the proposed Insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment . . . and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge.

In addition, the Kirwans' title insurance policy provides:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
>
> . . . .
>
> 3. Defects, liens, encumbrances, adverse claims or other matters:
>
> . . . .
>
> (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy[.]

The language of the title commitment is clearly intended to force the insureds to tell Chicago Title what they know or come to know about the property and its title, which is not of record, so that the risk which Chicago Title assumes in the policy can be assessed and guarded against. The quoted provision of the policy clearly excludes from coverage those claims which the

insureds had knowledge about, but failed to disclose in writing to the insurer. Such limitation on liability is consistent with *Farm Bureau Ins. Co. v. Witte*, 256 Neb. 919, 594 N.W.2d 574 (1999). All parties agree that the Kirwans learned of the adverse claim after the commitment was issued, but never informed Chicago Title about the claim before the policy was issued and, in fact, waited until litigation about the claim had begun.

The Kirwans argue that the district court's decision is erroneous because it

> leaves a *bona fide* purchaser who relies on a title commitment at risk, and without coverage, for the interval between a commitment and the policy date. . . . [I]f the insured learns of a claim within this interval, the insurer has no duty to defend. . . . It creates a "catch" for innocent insureds who learn of an adverse claim after closing while awaiting their policy, and leaves them uninsured though their premium is paid.

(Emphasis in original.) Brief for appellants at 12.

Additionally, the Kirwans ask us to conclude that the effect of the above-quoted language of the commitment and the policy, when taken together, is an illegal "bait and switch" and as such is an unfair trade practice in violation of Neb. Rev. Stat. § 44-1525(1) (Supp. 1999) and "*SDCL* Ch. 58-33." Brief for appellants at 15. The cited Nebraska statute prohibits a number of things, e.g., "[m]aking, issuing, circulating . . . any estimate, illustration, circular, statement . . . which . . . [m]isrepresents the benefits, advantages, conditions, or terms of any policy." § 44-1525(1). If we understand the Kirwans' argument, it is that the commitment was less restrictive than the policy and that when the policy arrived, it excluded something that had not been previously excluded from coverage. Of course, we cannot ignore that what is excluded is an adverse claim of which the insured was aware but had not informed Chicago Title. The Kirwans argue that the coverage had "switched" from the commitment (which excluded a claim only if Chicago Title was prejudiced by nondisclosure) to the policy (which excluded a known but undisclosed adverse claim) regardless of whether Chicago Title was prejudiced. While this is true, this argument ignores the fact that the commitment provides that "all liability and obligations here-

under shall cease . . . when the policy . . . committed for shall issue." In short, the terms of the commitment provide that it ceases to exist once the policy issues because the commitment is only an agreement to issue a policy. Therefore, the obligations of the commitment are replaced by those of the policy. There is no showing in this record that the terms and conditions of the policy were not known to the Kirwans, or knowable by them had they asked Chicago Title. Without such evidence, there plainly is no misrepresentation.

The fact is that the policy commitment is written to force the insured to disclose known potential adverse claims not of record so that Chicago Title can amend Schedule B (the matters not insured against) to include an adverse claim which arises after the commitment is issued, but before the policy is issued. The ability to amend the schedule is expressly provided for in paragraph 2 of the conditions and stipulations of the commitment, and thus there was no representation that late-disclosed adverse claims could not be excluded by the policy issued after the commitment. The Kirwans' position that Chicago Title cannot exclude coverage for the Vanderwerf litigation, given that it was not of record or disclosed, is tantamount to a driver buying automobile insurance on Monday and complaining because the insurance company will not cover the accident occurring 2 days before on Saturday. The clear language of the commitment allows Chicago Title to exclude or limit coverage on Schedule B when the policy is issued for an adverse claim which comes to light after the commitment but before the policy is issued. However, nondisclosure results in a new and undisclosed adverse claim being excluded from coverage. By the time the Kirwans disclosed the Vanderwerfs' claim, the commitment had "evaporated" by its express terms and the policy controlled, meaning that Chicago Title did not need to show that it had suffered prejudice from the nondisclosure.

The district court, in its well-reasoned order, said regarding prepolicy issuance acquisition of knowledge of adverse claims by the proposed insureds:

> The rationale of title insurance is a coverage of risks ascertainable to both parties from the public records and not otherwise ascertainable by the proposed insured and the

insurer. Permitting an insured to obtain coverage for something he or she knew about, but which was unknown and unknowable to the insurer, upsets the actuarial basis and justification for title insurance. Common sense supports the application of an exclusion to such situations[.]

Underlying the resolution of this issue is the fact that a title commitment, which might also be called a binder, is not the same as a title insurance policy. Black's Law Dictionary 266 (7th ed. 1999) defines commitment as "[a]n agreement to do something in the future" and defines a binder as "[a]n insurer's memorandum giving the insured temporary coverage while the application for an insurance policy is being processed or while the formal policy is being prepared," *id.* at 161. Thus, a commitment or binder is a temporary contract of insurance. See *Lindsay Ins. Agency v. Mead*, 244 Neb. 645, 508 N.W.2d 820 (1993).

In *Tess v. Lawyers Title Ins. Corp.*, 251 Neb. 501, 511, 557 N.W.2d 696, 703 (1997), the court stated:

The title insurance commitment, oftentimes referred to as a binder, is not a title policy. . . . [I]t is often in the form of a preliminary report on the status of the title. As such, it is issued at the end of the title search process undertaken by the insurer. D. Barlow Burke, Jr., Law of Title Insurance § 15.2 (2d ed. 1993). In contrast, title insurance is a contract for indemnity under which the insurer is obligated to indemnify the insured against losses sustained in the event that a specific contingency, e.g., the discovery of a lien or encumbrance affecting title, occurs. See *Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154 (1984).

The Kirwans argue that "[n]either South Dakota nor Nebraska law permits a title insurer to vary terms between a title commitment and a subsequent policy," brief for appellants at 17, but no supporting authority is advanced—perhaps because the argument must ignore the distinction between the commitment or binder and the policy. In our view, the title commitment was a separate agreement which had a different purpose than the actual title insurance policy. The commitment in effect "guaranteed" the issuance of a certain type of title insurance, subject to the conditions and stipulations in the commitment, but to be

covered, adverse claims had to be disclosed to Chicago Title if knowledge thereof was acquired by the insured between binder and policy.

The Kirwans further assert as part of their argument against the exclusion of coverage for the Vanderwerfs' claim that they believed the claim was not serious. In the Kirwans' brief, they state that they

> and their attorney received a vague, threatening letter from a South Dakota lawyer claiming his client had an interest in the land. The letter ambiguously claimed either a right to sale proceeds for the land, or an interest in title. Neither the buyers nor their attorney took the threat seriously; in any event, the transaction had already closed.

Brief for appellants at 16.

The letter to the Kirwans was from an attorney and clearly asserted that the Vanderwerfs had either a right to the sale proceeds or an interest in title to the land. That is all the Kirwans needed to know in order to alert Chicago Title to this "adverse claim." Whether they believed it to be meritorious and serious is completely beside the point. Once the Kirwans got notice, they were dutybound to give notice to Chicago Title, and since they failed to do so, the policy, which was issued and superseded the binder, excluded the Vanderwerfs' claim from coverage.

### Lack of Prejudice Because Kirwans Win Lawsuit.

The Kirwans argue that because they were successful in defending the South Dakota case filed by the Vanderwerfs, Chicago Title was not prejudiced by the delay in notification of the adverse claim and cannot exclude the claim from coverage. This argument at the outset ignores the difference between the commitment and the policy. Nonetheless, their argument is that as long as the purpose of the notification clause was fulfilled, then the insurer should not be relieved from its obligations to defend under the policy. The purpose of most notification clauses in insurance policies is to put the insurer on notice of a potential claim and to afford the insurer an opportunity to promptly investigate the merits of the claim. However, a notification requirement in a binder is different because it is, in effect, an underwriting device which forces disclosure of adverse

claims not of record which present a potential risk to the title. The disclosure enables the insurer to assess the risk, describe it as it wants in Schedule B "Exceptions from Coverage," and charge a premium which is reflective of the risk being carried. The insured can then determine whether the coverage set forth in the policy, with exceptions, is worth the proposed premium. The fact that the adverse claim later proves nonmeritorious does not dispense with the insurer's understandable desire to know what the insured knows and which is not of record. In this way, the insurer can assess the risk posed by the adverse claim uncovered after the commitment, but before the policy is issued. We have little doubt that if this was a health care policy with exclusions for known preexisting conditions, a claim that a known but undisclosed condition such as leukemia should be covered because its treatment later proved successful, would likely not succeed in the patient's suit for the cost of treatment. The Kirwans' argument is similarly unpersuasive. The Kirwans' argument suffers from a failure to appreciate Chicago Title's contractual ability to rewrite the "Exceptions from Coverage" during the pendency of the commitment, as well as a failure to recognize that paying to defend a claim of which it was uninformed is inherently prejudicial to Chicago Title.

The exclusions we are dealing with in the commitment and policy concern adverse claims which the insured became aware of *before* the effective date of the policy. The cases which have found that the insurer must have been prejudiced by the delay in notice concern claims made after the insurance policy has become effective. See, e.g., *Weir v. City Title Ins. Co.*, 125 N.J. Super. 23, 308 A.2d 357 (1973). In the *Weir* case, the court stated that it was well settled that where an application for insurance has been submitted to an insurer, but before a policy is issued, and a change of condition material to the risk occurs, the insured has an affirmative obligation to inform the insurer of the change. The *Weir* court found that the title insurance company was relieved of its obligations under its contract, where the insured was aware within 2 days after filing the application for title insurance that there was a defect in his title, and neither he nor his attorney informed the insurance company of that fact before the policy was issued. While we conclude that paying to

defend an undisclosed claim would be prejudicial to Chicago Title, a showing of prejudice was unnecessary.

*Chicago Title's Cross-Appeal.*

Chicago Title asserts that the district court erred in denying its counterclaim. Chicago Title counterclaimed against the Kirwans for $10,795.43 in attorney fees that Chicago Title paid First Trust for fees First Trust incurred in the defense of the Vanderwerfs' suit in South Dakota. Chicago Title asserts that it is entitled to recoup this expense from the Kirwans under the provisions of the Kirwans' mortgage agreement with First Trust in which the Kirwans warranted good and marketable title to First Trust and agreed to defend the title at the Kirwans' expense.

There are two relevant provisions in the mortgage between the Kirwans and First Trust which relate to Chicago Title's claim for reimbursement. First, the provision under the heading "Expenditures by Lender" provides in part:

> [I]f any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on Grantor's behalf may, but shall not be required to, take any action that Lender deems appropriate. Any amount that Lender expends in so doing will bear interest . . . . All such expenses, at Lender's option, will (a) be payable on demand, (b) be added to the balance of the Note . . . or (c) be treated as a balloon payment[.]

The second relevant provision, under the heading "Defense of Title," provides in pertinent part:

> Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice[.]

The South Dakota Supreme Court enforces and gives effect to the unambiguous language and terms of the contract. See *Cotton*

*v. Manning*, 1999 S.D. 128, 600 N.W.2d 585 (1999). These contractual provisions allow the lender to be represented by its own counsel. We find that these provisions in the mortgage are not ambiguous, and we therefore apply their clear meaning.

Under the contractual language of the mortgage, the Kirwans must defend an action against their title at their cost. First Trust can participate with counsel of their choice, and the cost can be added to the Kirwans' note, be due on demand, or treated as a balloon payment. The option among the three choices is First Trust's. However, here the claim for such fees is being made by Chicago Title because it made payment for First Trust's attorney fees, despite its position that the Vanderwerfs' claim was outside the policy. Thus, Chicago Title was a volunteer in paying First Trust's attorney fees, a position somewhat at odds with its refusal to pay fees for the Kirwans. But, in any event, it now wants its money back on the basis of subrogation. The district court rejected the subrogation claim and found that the mortgage only obligated the Kirwans to pay the fees that First Trust incurred. However, this decision ignores the "Expenditures of the Lender" provision we have quoted above wherein the fees of First Trust can be recouped from the Grantor (the Kirwans). Given that Chicago Title voluntarily paid the fees for First Trust, we now turn to its claim that it is entitled to collect such fees from the Kirwans via subrogation.

" '[S]ubrogation is an equitable doctrine and depends upon a just resolution of a dispute under a particular set of facts.' " *Julson v. Federated Mut. Ins. Co.*, 1997 S.D. 43, ¶ 8, 562 N.W.2d 117, 120 (1997), quoting *Vogt v. Schroeder*, 129 Wis. 2d 3, 383 N.W.2d 876 (1986). Thus, if the lender could recoup attorney fees it expended from the Kirwans, Chicago Title should be able to collect the fees it paid for the lender, since it was the entity that incurred the actual expense. In short, Chicago Title "steps into the shoes" of First Trust in terms of the right to recover the defense costs from the Kirwans. Subrogation is an equitable remedy that provides for an adjustment between the parties to secure the ultimate discharge of a debt by a person who, in equity or good conscience, ought to pay for it. *St. Paul Fire & Marine v. Amerada Hess Corp.*, 275 N.W.2d 304 (N.D. 1979), citing *National Garment Co. v. New York C. & St. L. R.*

*Co.*, 173 F.2d 32 (8th Cir. 1949). And if the Kirwans are contractually obligated to pay the fees of First Trust, the subrogation claim takes on added strength.

Since we have found that the Vanderwerf litigation was not covered by the title insurance in this case, it is inequitable that Chicago Title bear the cost of the Kirwans' attorney fees for the defense of the Vanderwerfs' claim when the Kirwans are contractually obligated to do so. Equitable and contractual subrogation allow Chicago Title to recover such fees and costs. Contractual subrogation occurs where one having no interest or any relation to the matter pays the debt of another, and by express or implied agreement is entitled to the rights and securities of the creditor so paid. See 73 Am. Jur. 2d *Subrogation* § 9 (1974). It is not necessary that there be a contract concerning such costs between Chicago Title and the Kirwans, as equity supplies the doctrine of subrogation as a matter of doing justice rather than a matter of exacting performance of a contract. See *id.*

We find that the mortgage allows First Trust to require reimbursement from the Kirwans for attorney fees it expended in the Vanderwerf litigation. Since Chicago Title paid First Trust's attorney fees, we find that Chicago Title can stand in the place of First Trust and require the Kirwans to reimburse it for those fees it paid to First Trust in connection with the Vanderwerf litigation. We therefore reverse the decision of the district court on this issue.

In the Kirwans' answer to Chicago Title's counterclaim, they assert that they could not admit or deny Chicago Title's claim as to the amount of attorney fees because the Kirwans were without knowledge concerning that matter. Although the Kirwans asserted in their answer that if such costs were incurred, that the costs were unreasonable and unnecessary, they did not argue this point in their brief on the cross-appeal.

In the record before us, there are two affidavits which support the amount of attorney fees paid by Chicago Title to First Trust. Jerry L. Wattier is an attorney from the law firm which defended First Trust in the Vanderwerf litigation. His affidavit contains the firm's billing records for the work it did on the Vanderwerf case for First Trust. The total amount stated was $10,795.43. Wattier

also stated in his affidavit that these fees have been paid by Chicago Title to the firm. In addition, the affidavit of Steven J. Tierney, an associate vice president and an attorney for Chicago Title, states that Chicago Title "has or will pay legal fees and expenses totaling $10,795.43 to Mr. Wattier's law firm." Both affiants stated that the amount of the fee was reasonable and was necessary in order to defend the interests of First Trust. The burden shifted to the Kirwans to put evidence before the court to dispute the reasonableness or necessity of the fees. See *Chalupa v. Chalupa*, 254 Neb. 59, 574 N.W.2d 509 (1998) (holding that if movant for summary judgment submits affidavit as to material fact and that fact is not contradicted by adverse party's evidence, court will determine that there is no issue as to that fact). Having failed to do this, there is no genuine issue of material fact for trial on the fees, and we find in Chicago Title's favor on the counterclaim in the amount of $10,795.43 and direct the district court to enter judgment accordingly.

## CONCLUSION

Finding no merit to the Kirwans' arguments, we affirm the grant of summary judgment to Chicago Title. We reverse the grant of summary judgment to the Kirwans on Chicago Title's counterclaim and remand it for entry of judgment in Chicago Title's favor in the amount of $10,795.43.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED.